**STATE of Maine**

v.

**Charles O. CHATTLEY, Jr. and David W. Griffin.**

Supreme Judicial Court of Maine.

Aug. 8, 1978.

---

4. P.L.1945, ch. 247.

Michael E. Povich (orally), Dist. Atty., Ellsworth, for plaintiff.

Silsby & Silsby by Raymond L. Williams (orally), William S. Silsby, Jr., Ellsworth (Charles O. Chattley, Jr.), Libhart, Ferris, Dearborn & Willey by Joel A. Dearborn, Brewer (orally) (David W. Griffin), for defendants.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and NICHOLS, JJ.

McKUSICK, Chief Justice.

Appellants Charles O. Chattley, Jr., and David Griffin appeal from judgments entered following a jury trial in the Superior Court in Hancock County. Defendants were jointly tried for burglary (17–A M.R.S.A. § 401) and theft (17–A M.R.S.A. § 353).[1]

We deny the appeals.

Defendant Chattley raises four separate issues on appeal. Defendant Griffin joins in two of those issues. We shall address those issues raised by both defendants first and then proceed to those raised solely by defendant Chattley.

## I.

Defendants offer two grounds upon which they argue that the evidence seized on the night of their arrest and that seized the following day should have been suppressed. Primarily, they argue that the police lacked probable cause for the initial stop, thereby rendering any information obtained at that time illegal and making any subsequent arrests or seizures "fruit of the poisonous tree." Defendants also contend that the initial "search" of the pickup went beyond the scope of a permissible warrantless search, thus denying the State the use of any information gained therefrom.

The testimony given at the suppression hearing established the following rather involved factual sequence. During the evening of April 7, 1977, at approximately 9:00 p. m., Donald Fish drove past a hunting camp owned by Frank Cook. Everything appeared to be in order, with a bar across the front door and a rope across the driveway.[2] At 10:50 p. m. Mr. Fish again passed the Cook camp. That time, however, he noticed that the front door was ajar and that a red pickup truck was parked at the end of the driveway. Having had his own camp broken into on several occasions, Mr. Fish's suspicions were aroused. Proceeding to a nearby hill, he used his citizens band radio to call Hancock County Deputy Sheriff Robert Larson, with whom he was personally acquainted. Mr. Fish informed Deputy Larson of both the condition of the camp and the description of the truck, including the license plate number. At that point, the pickup having left the camp passed Mr. Fish heading west on Route 9.

---

1. 17–A M.R.S.A. § 401 states in part here relevant:

   "1. A person is guilty of burglary if he enters or surreptitiously remains in a structure, knowing that he is not licensed or privileged to do so, with the intent to commit a crime therein."

   17–A M.R.S.A. § 353 states in part here pertinent:

   "1. A person is guilty of theft if he obtains or exercises unauthorized control over the property of another with intent to deprive him thereof."

   "1. A person is guilty of theft if he obtains or exercises unauthorized control over the property of another with intent to deprive him thereof."

2. Donald Fish was accompanied by Charles Decrow. Mr. Decrow neither testified at the suppression hearing nor at the trial and his presence is therefore irrelevant to this appeal.

Deputy Larson was immediately apprised of that fact.

Upon receiving the information from Mr. Fish, Deputy Larson radioed the State Police barracks and gave them the license number. He was told that the vehicle belonged to Jasper Tilden, a relative and employer of defendant Chattley, and was a "red GMC, sixty-one pickup," thus corroborating Mr. Fish's initial description. This information was relayed to the Hancock County Sheriff's Department. Deputy Larson thereupon proceeded to the Cook camp to inspect the premises. His inspection revealed that the front door had been pried open and that several frying pans and a kettle were missing. This information was also relayed to the sheriff's office.

Meanwhile, Deputy Sheriffs Graves and Marshall, also of the Hancock County Sheriff's Department, overheard Deputy Larson's initial broadcast to the State Police barracks. Returning to the sheriff's office, they were told there had been a possible break-in. They immediately left the sheriff's office and proceeded down Route 179[3] toward the Cook camp. Before they reached the camp, however, they recognized the suspect vehicle traveling in the opposite direction. The deputies reversed direction and stopped the pickup. As Deputy Graves approached the vehicle he shone his flashlight into the open bed of the truck, observing the end of a pry-bar, several frying pans, and a kettle. He proceeded to the driver's window where he recognized defendant Chattley as the driver and defendant Griffin as the passenger. After several inquiries defendant Chattley informed Deputy Graves that if no charges were going to be made, he was going to leave, which he proceeded to do. The deputies followed in their vehicle and, upon learning by radio of Deputy Larson's findings at the Cook camp, again stopped the truck and arrested the defendants. Deputy Graves thereupon

seized the items he had previously seen in the rear of the pickup and impounded the vehicle. It was towed under supervision to the sheriff's office where it was locked. The next morning a further search was made, revealing more items that were allegedly missing from the Cook camp, including a fire extinguisher and a hatchet bearing Mr. Cook's social security number engraved on the handle. These items were also seized. Both the items seized at the time of the arrest and those seized the morning after were introduced and admitted as evidence at trial.

█ As previously noted, defendants argue that the police lacked probable cause for the initial stop of the vehicle. Whether or not there was probable cause *to arrest* at that point, we need not decide. The United States Supreme Court, in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967), clearly set forth the scope of a permissible "stop and frisk."[4] Therein the Court noted that even though there are insufficient facts to provide probable cause for arrest, police officers have a limited right under appropriate circumstances to stop a suspect for questioning and investigation. *Id.* at 11, n. 5, 88 S.Ct. 1868; *see also Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *State v. Babcock,* Me., 361 A.2d 911, 914 (1976) (applying *Terry* to motor vehicles). The Court made it clear, however, that "appropriate circumstances" meant that an officer must be able "to point to specific and articulable facts, which taken together with rational inferences from those facts," warrant an intrusion into a constitutionally protected area. *Terry, supra* at 21, 88 S.Ct. at 1880. The question thus becomes whether there were present sufficient "specific and articulable facts" to justify Deputy Graves in stopping the defendants. At the time of the initial stop, Deputy Graves had been informed that a

---

3. Testimony revealed that Route 179 intersects Route 9 and that one traveling from the Cook camp toward defendant Chattley's residence in plantation # 8, the uncontroverted destination of the defendants, would first proceed down Route 9 and then turn onto Route 179.

4. Although there is no evidence of a "frisk" having occurred, it is beyond question that Deputy Graves' conduct at the initial encounter with defendants constituted a "stop," thereby invoking the rule set forth in *Terry.*

possible break-in had occurred at the Cook camp and that a red pickup truck with a known license plate number had been seen in the driveway. Since he had that information, including the license number, we find it completely reasonable for Deputy Graves, upon recognizing the suspect vehicle, to stop it and seek further information. It should be noted that Deputy Graves made no attempt to detain the defendants when they evidenced an intention to leave. We therefore hold that the initial stop fell within the bounds of legally permissible stops. *Cf. State v. Hillock*, Me., 384 A.2d 437 (1978).

■ Defendants next contend that Deputy Graves' brief inspection of the open bed of the pickup was illegal in that it went beyond the scope of the "plain view" doctrine and was made with the aid of artificial illumination. We disagree on both points. The classic definition of the scope of the "plain view" doctrine is that set forth in *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). The Court there stated that "[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Id.* at 236, 88 S.Ct. at 993. *See also State v. Cowperthwaite*, Me., 354 A.2d 173, 176 (1976); *cf. State v. Poulin*, Me., 268 A.2d 475, 480 (1970) (open view). We have already noted that Deputy Graves was lawfully in the position he was in. There is no evidence to support a conclusion that he did anything more than merely peer into the exposed rear of the truck. The fact that artificial illumination was used to aid in his view does not affect the validity of his conduct. *See State v. Stone*, Me., 294 A.2d 683, 688 (1972). We therefore find nothing impermissible in Deputy Graves' actions.

■ Defendants finally argue that the police lacked probable cause to arrest dur-

ing the second stop, thereby invalidating the arrests and the subsequent seizures. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Defendants base their contention on the theory that the initial stop was illegal, thus precluding the use of the knowledge Deputy Graves gained during the initial stop to support a finding of probable cause to arrest during the subsequent stop. We have already disposed of the legality of the initial stop. The issue, therefore, becomes whether there were sufficient facts at the time of the arrests to "warrant a prudent and cautious man in believing that the arrested person[s] had committed . . . a felonious offense." *State v. York*, Me., 324 A.2d 758, 763 (1974). An affirmative answer would necessarily cause defendants' contention to fail.

Our recent opinion in *State v. Parkinson*, Me., 389 A.2d 1 (1978), discussed fully the requirements for probable cause necessary to make a warrantless arrest. We need not go through them again. Suffice it to say, at the time of the arrest, Deputy Graves knew or there could be attributed to him knowledge that (1) there had been a recent break-in at the Cook camp, (2) a red pickup truck with a license number matching that of defendants' had been seen at the camp, with the previously barred front door ajar, and (3) certain items matching those he had seen in the rear of the pickup were missing from the camp. Plainly these facts constituted probable cause to arrest.

II.

■ Defendants' second point on appeal concerns the selection and impaneling of the jury. Their contention is that jurors Alley ( # 2) and Hamor ( # 23) should have been excused for cause, with the presiding justice's refusal to do so causing the defendants to exercise two of their peremptory challenges.[5]

---

5. Defendants used all of their peremptory challenges; their argument is, therefore, not barred by the rule in *State v. Albano*, 119 Me. 472, 111 A. 753 (1921), which denies a defendant the right to complain of a judge's failure to dismiss

a juror for cause if the defendant allows the juror to sit on the jury even though he had not exhausted all of his peremptory challenges. *See* Glassman, *Maine Practice* § 24.4 (1967).

At the behest of defendant Griffin's counsel, the presiding justice during the jury *voir dire* asked if any of the prospective jurors had law enforcement officers in their immediate families. Juror Alley responded in the affirmative, stating her husband was a member of the Bucksport, Maine, police department. The following exchange took place:

"THE COURT: Mrs. Alley, would that fact make it difficult for you to assess the credibility of other officers who might testify?

"MRS. ALLEY: No.

"THE COURT: In other words, you would not give more weight to police officers' testimony just from the fact he was a police officer?

"MRS. ALLEY: No, I don't believe I would sir."

We find nothing improper in the presiding justice's decision not to dismiss Mrs. Allen for cause given his efforts to probe the juror's impartiality. The defendants, nevertheless, press for a *per se* rule excluding the spouse of any police officer. Defendants have failed to direct us to any other jurisdiction adopting such a rule. On the contrary, we find that the federal courts reject, apparently uniformly, any such presumptive disqualification of the relatives of policemen. *See, e. g., United States v. Caldwell*, 178 U.S.App.D.C. 20, 34, 543 F.2d 1333, 1347 n. 53 (1974). We do not accept the view implicit in the defendants' argument that any and every spouse of a police officer would *not* fairly and impartially assess the credibility of other police officers. The presiding justice appropriately satisfied himself of the impartiality of the particular juror then on *voir dire* before him, and we find no reversible error in this case in his not dismissing her for cause on a *per se* rule.

In regard to juror Hamor, defendants argue that his relationship with defendant Chattley so colored his judgment as to require his dismissal for cause. At the *voir dire*, juror Hamor stated that although he lived in the same town as did defendant Chattley and was acquainted with him, he felt his judgment would not be impaired. At that point, counsel stated they had no further questions. Much later, however, during the hearing on the motion for new trial, it was revealed that Mr. Hamor had been involved in a potentially serious confrontation with defendant Chattley. It is that altercation which defendants claim should have been brought out at *voir dire*, requiring Mr. Hamor's dismissal for cause.

Although he recognized the possible prejudice to defendants arising from Hamor's background, the presiding justice refused to grant defendants a new trial. The justice based his decision on two grounds: (1) that Mr. Hamor never actually served on the jury and (2) that defendants waived their objections by not specifically objecting at the *voir dire* on the basis of the alleged ill will felt by Mr. Hamor toward defendant Chattley. We find the second ground to be dispositive of this point on appeal. Although defendant Chattley raised a specific objection at the *voir dire* to Mr. Hamor on grounds not relevant here,[6] he in no way disclosed to the presiding justice any specific basis such as that later alleged in the motion for new trial. When a party has knowledge of facts, or could with due diligence ascertain facts, bearing on a juror's qualifications to serve on a jury but fails to apprise the court of those facts within such time as to allow it to correct any possible error, the party waives any right subsequently to raise that objection. *See Kane v. Erich*, 250 Ark. 448, 465 S.W.2d 327, 329 (1971); *cf. Boynton v. Adams*, Me., 331 A.2d 370 (1975); *Bowe v. Willis*, Me., 323 A.2d 593 (1974). It is beyond dispute that at the time of the *voir dire* defendant Chattley had knowledge of the altercation in which he had himself participated with Mr. Hamor. His failure to raise the objection at that time precludes his raising it at a later date.

---

**6.** At the *voir dire* defendant Chattley challenged Mr. Hamor for cause, alleging that he was a police officer, thereby destroying his impartiality. The presiding justice denied the motion due to lack of evidence in the record. The defendant did not renew this objection on appeal, and we therefore express no opinion thereon.

■ Defendant Griffin also complains on appeal that juror Hamor should have been dismissed for cause. The record reveals, however, that defendant Griffin (unlike his co-defendant) raised no objection at all, general or specific, to Mr. Hamor at the time of the *voir dire* and therefore has not preserved the point on appeal, regardless of whether he shared defendant Chattley's knowledge of the Hamor-Chattley altercation. *See Reville v. Reville*, Me., 289 A.2d 695 (1972); *Walsh v. City of Brewer*, Me., 315 A.2d 200 (1974).

■ A further and overriding answer to both defendants' attack on the justice's handling of the jury selection process is provided by Rule 24(c)(3), M.R.Crim.P. That rule states in part:

"If the offense charged is a Class A, Class B or Class C crime, *each side* shall be entitled to 8 peremptory challenges."[7] (Emphasis added)

As the Reporter's notes state, this rule was taken from 15 M.R.S.A. § 1259 (1964), the prior law which allowed eight peremptory challenges to "the accused." That section had been construed in *State v. Cady*, 80 Me. 413, 14 A. 940 (1888), to mean that when more than one defendant are jointly indicted and tried, they are entitled *jointly and not severally* to the eight peremptory challenges. When adopted, Rule 24(c)(3) merely incorporated from the existing statute, 15 M.R.S.A. § 1259 (1964), the number of peremptory challenges, namely, eight, then allowable to "the accused"; and by substituting the words "each side" for "the accused" made clear the intent to continue the rule of *State v. Cady, supra. See* Reporter's Notes to Rule 24(c)(3), M.R.Crim.P., Glassman, *Maine Practice* 177, 178 (1967). The presiding justice, in allowing *each* defendant eight challenges, gave them much more than they were entitled to under Rule 24, and therefore no possible prejudice can

be shown by defendants in having to use two of their peremptory challenges to take Mrs. Alley and Mr. Hamor off the jury that tried them.

## III.

■ The third point on appeal is raised solely by defendant Chattley. He asserts that the trial justice erred in not granting a new trial on the grounds of prejudice. In addition to realleging the situation involving juror Hamor, defendant Chattley further alleges that not only was he prejudiced by the presence of Stanley Mitchell on the jury in that he had had, he claimed, a fight with Mr. Mitchell in the recent past, but also that Mr. Hamor made gestures to Mr. Mitchell during the trial, thereby rendering Mitchell's judgment suspect.

We have already disposed of the argument in regard to Mr. Hamor. The trial justice, after hearing the testimony of Mr. Mitchell at the hearing on the motion for a new trial, found "beyond a reasonable doubt" that no fight had ever taken place, thereby precluding the possibility of any prejudice. As that was a finding of fact, the defendant carries the burden of showing that the trial justice was clearly erroneous. We find that the defendant has not met his burden.

Finally, although the presiding justice failed to make specific findings of fact regarding Mr. Hamor's alleged gestures to Mr. Mitchell, a finding adverse to defendant's position is implicit in the court's denial of the motion for a new trial. The defendant, having not shown that the trial justice was clearly erroneous in those findings, cannot prevail on appeal. *See State v. Walker*, Me., 341 A.2d 700, 702 (1975).

## IV.

■ The final point on appeal is again raised solely by defendant Chattley,[8]

---

7. Defendants were charged with burglary, a Class B crime. 17–A M.R.S.A. § 401(2)(B) (1977).

8. Although defendant Griffin has not raised on appeal any question as to the sufficiency of the

evidence to convict him of participation in the crime committed at the Cook camp, we on our own initiative note that the circumstances of his presence as a passenger in the implicated truck soon after the break sufficiently sup-

who argues that the trial court erred in not granting his motion for acquittal on the ground that the trial evidence contained an equally plausible story supporting innocence, and therefore the jury could not have found him guilty beyond a reasonable doubt. As we have stated on numerous occasions, it is for the jury, and not for either the trial justice or the appellate court, to resolve conflicts and inconsistencies in the testimony of the witnesses appearing at trial. *See State v. Lawless*, Me., 387 A.2d 30 (1978); *State v. Fournier*, Me., 267 A.2d 638, 641 (1970). The defendant has shown no possible reason for departing from that time-honored rule on the record in this case.

The entry must be:

Appeals denied.

Judgments affirmed.

GODFREY, J., did not sit.

ported the jury's finding of Griffin's guilt. Contrast *State v. Field*, Me., 383 A.2d 1390 (1978) (3-hour lapse between crime and observation of defendant as passenger in car with stolen property).