STATE of Maine

v.

Bruce McKENZIE.

Supreme Judicial Court of Maine.

Argued Jan. 11, 1982.
Decided Feb. 12, 1982.

David M. Cox, Dist. Atty., Gary F. Thorne, Asst. Dist. Atty. (orally), Bangor, for plaintiff.

Kobritz & Hamilton, Harold Hamilton (orally), Bangor, for defendant.

Before GODFREY, NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

WATHEN, Justice.

This is an appeal by the defendant Bruce McKenzie from a judgment of the Superior Court, Penobscot County, entered in accordance with a jury verdict finding defendant guilty of burglary, 17—A M.R.S.A. § 401 (Supp.1981). He challenges the trial court's order denying his motion to suppress statements and physical evidence. He also assigns as error the trial justice's instruction to the jury on the presumption arising from possession of recently stolen goods as defined in 17—A M.R.S.A. § 361(2) (Supp. 1981). Defendant further asserts that a rational trier of fact could not have found guilt beyond a reasonable doubt based on the evidence presented at trial. We find that the court below erred in denying defendant's motion to suppress, and vacate the judgment of conviction.

### I.

The factual account on which the suppression issue must be decided, while

lengthy and detailed, is not in dispute. On June 19, 1980, at 12 noon, Chief Hall of the Searsport Police Department received a call from Ms. Pat Noble, the proprietor of an antique shop located on Route 1 in Searsport. She informed the Chief that three young people traveling in a late model van had just been in her store trying to sell two antique Russian dolls and that she felt he should "check them out." Ms. Noble did not see the dolls and did not "convey a particular reason why she thought [he] should ... check on" the individuals. After receiving this information, Chief Hall proceeded to the vicinity of Route 1 searching for the late model red and white Ford van with Florida license plates containing a man and two women as described by Ms. Noble. He found the van at an antique store approximately one mile from Ms. Noble's shop, and shortly thereafter observed a man and two women return to the van. After the van had traveled about one half mile further down the road, the Chief pulled the van over, and asked the defendant for his license and registration. A computer check revealed that the van was not reported stolen, but information from a license check could not be obtained at that time. The officer asked the defendant what he was selling, and he said he had two antique Russian dolls which belonged to his grandmother. He then showed the officer one of the dolls. The officer allowed the defendant to depart.

Approximately one hour later, Chief Hall received a call from the Penobscot County Sheriff's Department informing him that the defendant's Florida license was under suspension. He returned to Route 1 and stopped the van once again. The defendant was given a summons for operating after suspension and the van was moved to the side of the road since neither of the female passengers had a license.

Upon returning to his office the Chief called an officer in the Bangor Police Department to find out if any dolls had been reported stolen in that area. He called Bangor because at the first stop defendant "said he was living up this way in Bangor." The Bangor police called the Chief two hours later to inform him that two antique Russian dolls had been reported stolen from a residence in East Corinth on June 7, 1980. Chief Hall returned to the van, which remained parked on the side of the road. He then asked the defendant to step from the van, and told him of the report from the Bangor police. Defendant again stated that the dolls belonged to his grandmother. The defendant was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and stated that he understood. Chief Hall then asked defendant if he would consent to a search of the van, and stated that otherwise he could apply for a search warrant. According to the officer, the defendant said "Here, right in the van; you can search here right inside, right behind the seat", and offered to get the dolls for the officer and entered the van by the side door. An officer accompanying Chief Hall reached into the van and seized the dolls. Thereupon defendant was arrested for theft by receiving stolen property.

An indictment was returned by a Grand Jury, Penobscot County, on August 4, 1980, charging defendant with one count of burglary (17—A M.R.S.A. § 401) and one count of receiving stolen property (17—A M.R.S.A. § 359). Defendant moved to suppress "evidence that was obtained by the State as the result of an unconstitutional search and seizure of" his automobile. After holding two testimonial hearings on the motion, the presiding justice issued an order denying the motion to suppress defendant's statements to Chief Hall (i.e., that the doll belonged to his grandmother, stated at both the first and third encounters on June 19, 1980) and the evidence seized as a result of the search conducted immediately before defendant was arrested (i.e., the two dolls).

At trial Chief Hall testified to the statements made by defendant that his grandmother owned the dolls, and the dolls were admitted into evidence. The jury returned a verdict of guilty on Count I of the indictment, after being instructed that they could not consider the second count if the defend-

ant was found guilty on the first count.[1] Defendant seasonably entered a notice of appeal to the Law Court.

## II.

The defendant has argued that the initial stop of the van was an unconstitutional seizure, and that all evidence obtained as a result thereof should have been excluded at trial. The State's argument is twofold: (1) the stop was a valid investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and (2) even if the stop was illegal, the dolls were obtained as a result of a consent search which, under the rationale of *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), was not tainted by the initial stop. Since there are no disputed facts on appeal, the issue presented is whether the presiding justice erred in applying legal principles to those undisputed facts. *State v. Hasenbank*, Me., 425 A.2d 1330, 1332 (1981).

■ "To justify an investigatory stop of a moving automobile, deemed in law a temporary seizure of the vehicle, the officer must be able to point to *specific* and *articulable facts* which, taken together with rational inferences from those facts, reasonably warrant suspicion of criminal conduct on the part of the occupants." *State v. Rand*, Me., 430 A.2d 808, 819 (1981). *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Bignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). An informant may be the source of facts supporting a limited *Terry*-type stop "as long as the information carried enough indicia of reliability to justify a stop . . . ." *State v. Hasenbank*, Me., 425 A.2d 1330, 1333 (1981). Information supplied by a known informant such as Ms. Noble may provide a stronger case than an anonymous telephone tip. *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *State v. Hasenbank, supra.*

At trial, the arresting officer testified that, the defendant had not been operating his vehicle in an unusual fashion prior to the first stop, and that once stopped he readily answered questions. At a hearing on the suppression motion, the Chief testified that the following facts caused him to stop defendant's van. (1) The van was registered in Florida. Defendant pointed out that this stop occurred during the tourist season and on Route 1. (2) "It was an older van, Florida plates, three young people that were going from one antique shop to the next to try to sell antique dolls." The Chief also testified that it was "fairly common" for people to travel along the strip of antique shops trying to sell antiques. (3) He had had a meeting with local antique dealers at which the group decided that "any problem they had amongst themselves with items taken or people selling items that they might suspect to have been stolen, or something, to call me." He also testified that at the time of the arrest there was no problem in Searsport involving traffic in stolen antiques. (4) The Chief's investigation was based on what Ms. Noble had told him, although there is nothing in the record to suggest that Ms. Noble told the police that she thought the dolls were stolen. (5) The investigation was based on Chief Hall's "observation" that there were "three young people with fairly long hair, perhaps dressed in kind of scruffy clothing and driving a late model van." The officer also stated that the defendant and the two women were "people who I felt really weren't dress [sic] the part of antique dealers." He also said they were not acting furtively.

Decisions upholding investigatory stops in circumstances similar to this case involve police conduct based on factors which are not present here. For example, in *State v. Elliot*, Utah, 626 P.2d 423 (1981), the defendants were charged with theft of a truck. On a Sunday afternoon, the defendants had attempted to sell autoparts to a gas station in order to pay for gasoline. They possessed numerous tires, rims, auto-

---

**1.** Neither party has raised any challenge to the trial court's instruction on this issue.

parts and auto tools which were piled in the back of their pickup truck. The defendants had managed to sell one tire, one rim and a tachometer to a station customer for a total of $10. They tried to sell other items at equally low prices. One of the customers called the police who then confirmed the report by conducting his own investigation at the station. After a wild car chase, the defendants were arrested. The court stated that the officer reasonably suspected that the auto parts were stolen and thus conducted a valid investigatory stop. The distinguishing features of *Elliot* are the attempts to sell merchandise at unreasonably low prices and the suspiciously unusual possession of a large quantity of marketable merchandise.

The determination of whether "[b]ased upon [the] whole picture the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity", *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), is primarily a question of fact. In applying the *Terry* test to the facts of this case, we find several clear deficiencies in the evidence supporting the validity of the stop. The informant in this case did not communicate to Chief Hall the nature of or reasons for her suspicions concerning defendant. There is nothing in the record to suggest that she saw evidence of the commission of a crime, see, e.g., *State v. Chattley*, Me., 390 A.2d 472 (1978) (informant saw defendant's pick-up truck at neighboring hunting camp which appeared to have been broken into), or the crime itself, see, e.g., *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (informant observed man in car with concealed weapon); *United States v. Hernandez*, 486 F.2d 614 (7th Cir. 1973) (gas station attendant observed blanket in back of van covering what appeared to be illegal aliens); *State v. Hasenbank*, Me., 425 A.2d 1330 (1981) (informant had seen defendant conceal a gun on his person). The present case is unique in that the informant, while undoubtedly reliable, conveyed to the officer only her conclusion that something was suspicious. Chief Hall was not justified in

resting his suspicions on the unsupported "hunch" of an informant. In doing so, the officer performed a stop which constituted an "intrusion upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result the [United States Supreme] Court has consistently refused to sanction." *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968).

In addition, the record indicates that Chief Hall had no knowledge of any recent thefts of antiques in his area. He stated that prior to the initial stop defendant did not act furtively, or conduct himself in a manner which would suggest criminal activity. Chief Hall himself admitted that it was "common" for people to try to sell antiques by seeking offers from several of the shops along Route 1. Neither the "hunch" of the informant as conveyed to the officer, nor his own observation of the defendant prior to the stop, provide specific and articulable facts reasonably warranting suspicion of criminal conduct. We find that the initial stop of defendant was an invalid investigatory stop, conducted in violation of defendant's Fourth and Fourteenth Amendment rights.

Since "the stop was not constitutionally permissible, evidence obtained as a result of such stop was inadmissible at appellant's trial and should have been suppressed." *State v. Babcock*, Me., 361 A.2d 911 (1976). The evidence obtained at the first stop, the defendant's statement that his grandmother owned the dolls, should have been suppressed by the presiding justice. The evidence obtained at the third stop, the dolls and a similar statement, also should have been suppressed if they were acquired as a result of the initial illegal stop. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The link between the first and third stops is obvious. The Chief testified that he called the Bangor police (and thus was informed of the East Corinth burglary) because during the first stop defendant had mentioned that he was living in the Bangor

area. There is no evidence in the record suggesting that Chief Hall would have called Bangor as a routine practice had he not received this information. Thus, it seems the third stop was a "fruit" of the first stop and so the evidence obtained should have been suppressed.

The State urges that the dolls were obtained as a result of a consent search which allegedly purged the taint arising from the illegal stop. As the United States Supreme Court has stated:

> We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Wong Sun v. United States*, 371 U.S. at 487–88, 83 S.Ct. at 417. In *Wong Sun*, the Court held admissible the confession of a defendant who voluntarily returned to the police station several days after his illegal arrest. The Court stated that the act of coming to the police station constituted "an intervening act of free will" which purged the "primary taint of the unlawful invasion." *Id.* at 486, 83 S.Ct. at 416.

■ A defendant's consent to a search may purge the taint of a stop or arrest conducted in violation of the Fourth Amendment. *See, e.g., United States v. Perez-Esparza*, 609 F.2d 1284 (9th Cir. 1980); *State v. Fortier*, 113 Ariz. 332, 553 P.2d 1206 (1976); *State v. Mitchell*, 360 So.2d 189 (La.1978). In deciding whether the invalid stop of the defendant requires suppression of the dolls as "fruit" of the initial illegality, we look to five factors: (1) the voluntariness of the defendant's [consent] . . . (a threshold requirement), (2) police compliance with *Miranda*, (3) the closeness in time of the arrest and statement, (4) the presence of intervening circumstances, and (5) in particular, the purpose and flagrancy of the police misconduct. [*Brown v. Illinois*] 422 U.S. [590, 95 S.Ct. 2254, 45 L.Ed.2d 416] . . . [(1975)]."

*State v. Bleyl*, Me., 435 A.2d 1349, 1360 (1981).

In this case, defendant has not claimed that his consent was involuntary. He received *Miranda* warnings moments before he consented to the search of his van, but also only moments after Chief Hall requested permission to search and informed defendant that otherwise he could apply for a search warrant. The invalid stop occurred approximately 3 hours prior to defendant's consent to the search. The only intervening circumstance was a second stop by Chief Hall who at that time gave defendant a summons for operating after suspension of his driver's license. There is nothing in the record to suggest that the conduct of Chief Hall was flagrant in any sense.

■ We find that the obvious connection between the invalid stop and the seizure of the dolls has not been dissipated by the defendant's consent to the search under the circumstances present in this case. *Miranda* warnings alone "cannot make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the" consent to search. *Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); *see Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). The congenial atmosphere found to be significant in *Rawlings, supra*, is not present in this case. Although the officer was courteous at all times, the defendant was stopped three times within three hours. Courtesy does not dissipate the taint created by an invalid stop.

We reject the State's contention that the dolls were properly admitted into evidence. The Superior Court erred in failing to suppress the evidence obtained as a result of the stop, namely the dolls [2] and the defend-

---

**2.** We are not called upon to decide to whom the property should be returned. The Superior Court may consider the issue of return if

ant's statements concerning ownership. Our decision on the first basis of challenge renders it unnecessary to consider the remaining assignments of error.

The entry is:

Judgment vacated.

Case remanded to the Superior Court for entry of an order suppressing evidence and for further proceedings consistent with the opinion herein.

All concurring.

presented pursuant to M.R.Crim.P. 41(e) or in a plenary proceeding.