**STATE of Maine**

v.

**Herbert J. WENTWORTH, Jr.**

Supreme Judicial Court of Maine.

Argued Sept. 20, 1983.

Decided July 16, 1984.

Michael Povich, Dist. Atty., Garry L. Greene, Asst. Dist. Atty. (orally), Ellsworth, for plaintiff.

Libhart & Ferm, William N. Ferm (orally), Ellsworth, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

WATHEN, Justice.

The defendant, Herbert Wentworth, Jr., appeals from a judgment of the Superior Court (Hancock County), entered in accordance with a jury verdict finding him guilty of burglary, 17–A M.R.S.A. § 401(C) (1983), and theft, 17–A M.R.S.A. §§ 353, 362(2) (1983). Defendant sets forth twenty-two separate arguments claiming error relating to search, seizure, arrest, statements, trial and verdict. We conclude that defendant's conviction does not result from harmful error and therefore we deny the appeal.

I

The facts surrounding the apprehension and arrest of defendant may be summarized as follows: On November 27, 1981, Officer William Ferretti of the West Bridgewater, Massachusetts Police Department received a message from the department police dispatcher, reporting that a man had

> just been in the Red Barn Clock Shop and had attempted to sell a gold Hamilton, open-faced pocket watch, and that during the course of the transaction he became nervous, he left the store, ran across the street, and got into a [small green] vehicle located near a supermarket across the street.

After unsuccessfully attempting to locate the small green automobile in the area of the Red Barn Clock Shop, Ferretti entered the shop and spoke with the owner, Richard Swan. Officer Ferretti testified that when he first arrived at the Red Barn Clock Shop "Mr. Swan handed me a piece of paper and gave me, again, a description of the individual." He testified that Swan actively cooperates with the police in investigations and described his familiarity with Swan's business operation in the following terms:

1. Swan provided Ferretti with a description of Alvarez.

2. Immediately above the signature line on the bill of sale form was the following printed state-

We'll go there, on the average, once or twice a day. We have a special folder at the station set up for transactions that occur there because of the extensive sale of gold, silver, jewelry items, things like that. And we've been familiarized with the set up that Mr. Swan has there, and have used this system in the past.

He testified that he had been employed as a police officer in that community for eight years and that the piece of paper handed to him on his arrival was "a bill of sale form that Mr. Swan had made up in *any and all* transactions recorded at the—his business. He requires that the individual that is selling the merchandise fill out this form indicate on the form the amount of money—." (emphasis added).

Ferretti testified that when he entered the shop on this occasion he asked Swan if he had recorded the transaction on video film. He described the location of a video camera directly behind the counter where transactions take place which records all transactions together with the date and time. He also described a sign directly behind the counter which advises that transactions are being recorded and that any transaction could result in criminal prosecution. Swan related to Ferretti the following events. A man, later identified as Robert Alvarez,[1] had entered the Red Barn Clock Shop and offered to sell a gold pocket watch. After Alvarez asked $300 for the watch, Swan offered $100 and handed him a bill of sale form. Although Alvarez began to fill out the form, when he reached the place on the form reserved for his signature,[2] he stated that he was unsure of whether he wanted to sell, picked up the watch, and "hurriedly" left the store and ran across the street where he got into a small blue vehicle with a license plate containing black numbers on a white background.

ment: "Anyone selling stolen merchandise to this shop does so at their peril and agrees to make full restitution, plus any other costs incurred by us."

After listening to Swan's account of the aborted sale, Ferretti asked to view the videotape. Before being able to do so, however, Ferretti directed Swan's attention to a small blue car outside the shop which Swan identified as the car in question. Ferretti, aware of recent thefts of silver, coins, and jewelry in the area, radioed fellow officer William Thayer and directed him to stop a blue vehicle bearing Maine license plates, and occupied by three individuals. Thayer soon spotted and stopped this car.[3] After Ferretti joined Thayer at the scene of the stop, a sequence of events ensued which culminated in the arrest of the driver, Darlene Baker, for operating without a license and the arrest of the two passengers, Robert Alvarez and defendant Wentworth. Various items of contraband and valuable antiques were found in the automobile.[4]

Wentworth, arrested for possession of marijuana and stolen goods in violation of Massachusetts law, was taken to the West Bridgewater police station. The West Bridgewater police, learning that Wentworth lived in Hancock, Maine, contacted the Hancock County Sheriff's Office. The Hancock County sheriffs, believing that some of the items recovered from Wentworth's vehicle had been stolen from an antique shop in Maine, obtained an arrest warrant for Wentworth and his companions on the charges which are the subject of this appeal.

## II

After indictment in Maine on the charges of burglary and theft, defendant moved to suppress all of the evidence acquired as a result of the original stop of the vehicle in which he was a passenger. He argues that the police acted illegally in stopping the vehicle because of the absence of an articulable suspicion of criminal activity under the doctrine of *Terry v. Ohio*, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Addressing the legality of the initial stop, the suppression justice explained the court's denial of the motion as follows:

> The stop in this case was very close to that described in *State v. McKenzie*, 440 A.2d 1072 (Me.1982). Distinguishing it is evidence of breaks in the area involving silver, antiques and jewelry; a number of transactions in the area involving stolen goods; and articulably suspicious behavior by Mr. Alvarez. The information provided by the proprietor of a store where Alvarez attempted to sell a watch was that the latter became nervous and left the shop in a hurry when he came to that portion of the bill of sale which advised that stolen goods were sold at one's peril and warranted title. Mr. Alvarez' odd behavior when confronted with this clause particularly separates this case from *McKenzie*. Based upon the information received, the officers had adequate grounds to stop the car.

Defendant asserts that the suppression justice erred in his ruling and specifically argues that the information provided to the officer did not include the fact that Mr. Alvarez "became nervous" nor that he left when "he came to that portion of the bill of sale which advised that stolen goods were sold at one's peril and warranted title." Defendant is correct that Swan did not tell Ferretti that the customer became nervous. The only reference to nervousness was that contained in the police dispatch and therefore that particular finding is unsupported. Further there was no direct testimony that Alvarez left when he came to the clause warning about stolen goods. Swan told Ferretti only that "when it came to the

---

**3.** Although Thayer, not Ferretti, stopped the car, we impute Ferretti's knowledge to Thayer for purposes of determining the reasonableness of the stop, where, as here, Thayer was acting on Ferretti's directions. *See Commonwealth v. Wooden*, 13 Mass.App. 417, 422, 433 N.E.2d 1234, 1237 (1982) (knowledge of officer who directs another to stop vehicle imputed to stopping officer).

**4.** A later inventory search of the automobile conducted at the police station uncovered further antiques, ivory, silver flatware, and an elephant tusk.

point where the individual is asked to sign the form, the individual made a statement to the effect that he was now undecided" and hurriedly left the store. The suppression justice could have inferred that because the reference to stolen goods appeared just above the signature line, the officer was justified in viewing this conduct as suspicious. Finally, defendant seeks to minimize the significance of Alvarez's sudden departure in the mind of the officer by noting there is no direct testimony that Ferretti was familiar with the location of the "stolen goods" clause on the bill of sale in relation to the signature line. Once again the suppression justice came to that conclusion by inference. The record contains ample evidence of the officer's complete familiarity with the business operation and his daily contact with the form bill of sale. Clearly the trier of fact was entitled to infer that the officer knew the location of the clause and that the officer reasonably concluded that the reference to "stolen goods" played some role in the sudden departure of Alvarez. Thus, the question presented on appeal is whether the court erred in determining that the officer had the basis for an articulable suspicion of criminal activity and whether that conclusion can stand in the absence of the unsupported factual finding that it was reported to the officer that Alvarez became nervous. We conclude there was no error in the court's ruling.

■ When, as in the present case, a law enforcement officer stops a moving vehicle for investigatory purposes, the Fourth Amendment is implicated.

> To justify an investigatory stop of a moving automobile, deemed in law a temporary seizure of the vehicle, the officer must be able to point to *specific* and *articulable facts* which, taken together with rational inferences from those facts, reasonably warrant suspicion of criminal conduct on the part of the occupants.

*State v. McKenzie,* 440 A.2d 1072, 1075 (Me.1982) quoting *State v. Rand,* 430 A.2d 808, 819 (Me.1981). *See United States v.*

*Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (moving vehicle); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (parked vehicle); and *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The obvious purpose of the rule is to protect the legitimate governmental interest in crime detection without subjecting members of the public to arbitrary detention. Accordingly, the "reasonable suspicion of criminal activity" standard requires more than an unsubstantiated hunch but less than the probable cause which would be necessary to support more intrusive measures such as a search of the vehicle or an arrest. *See State v. Taylor,* 363 So.2d 699 (La.1978); *People v. Cantor,* 36 N.Y.2d 106, 365 N.Y.S.2d 509, 516, 324 N.E.2d 872, 877 (1975) (reasonable suspicion is "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe that criminal activity" may be afoot). Whether such a reasonable suspicion exists in the mind of the officer in a particular case is primarily a question of fact, *State v. McKenzie,* 440 A.2d at 1076, and it is only when no competent evidence exists to support those findings that reversal is appropriate. *Lewisohn v. State,* 433 A.2d 351, 354 (Me.1981).

■ In the present case, the total circumstances known to the officer permit the conclusion that the particularized and objective basis provided was sufficient to justify the minimal intrusion involved in stopping the automobile. Although no single circumstance present in this case would justify detention, the cumulative impact of all the circumstances would permit an ordinarily prudent and cautious person to believe that criminal activity might be afoot. Alvarez approached a purchaser of gold, silver and jewelry, offering to sell a gold Hamilton, open-faced pocket watch. There was evidence of burglaries in the area involving silver, antiques and jewelry. There had been a number of transactions involv-

ing the sale of stolen goods. The police visited the business establishment once or twice a day and maintained a special file because of the extensive sale of valuables. The particular police officer involved was an experienced officer who was thoroughly familiar with the operation of the business, the existence and location of the videotape camera and sign warning of criminal prosecution, and the form and content of the documentation used in any transaction. The suspicious conduct of Alvarez was described to the officer by a known and reliable informant. As reported to the officer, when Alvarez was asked to sign the bill of sale, which included a reference to stolen property, he stated that "he was now undecided as to whether he wanted to sell the watch or not" and he picked the watch up and hurriedly ran across the street to a waiting car. Clearly the knowledge and experience of the officer, the character of the area, and the furtive conduct of Alvarez when confronted with the warnings contained on the sign and the bill of sale form are significant factors supporting the conclusion that a reasonable suspicion existed. *See, e.g., United States v. Oates,* 560 F.2d 45 (2d Cir.1977); *United States v. Magda,* 547 F.2d 756 (2d Cir.1976), *cert. denied* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977); *United States v. Bailey,* 547 F.2d 68 (8th Cir.1976). The present case is not a situation in which Alvarez was singled out on the basis of his conformity with a profile of suspected offenders, *contra Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), or on the basis of his response to the arrival of a uniformed officer, *contra Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). We recognize that in the context of a confrontation with the police, great care must be taken in evaluating the conduct of the suspect because of the nervousness inherent in such a situation. In this case the strange behavior of Alvarez occurred in the course of an otherwise uneventful com-

mercial transaction and in the total absence of any involvement by the police. Viewing the totality of the circumstances, the Superior Court did not err in concluding that the officer had specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted suspicion of criminal conduct sufficient to justify stopping the vehicle.[5]

### III

Defendant next argues that even if the initial stop of the vehicle was valid, the intrusion which occurred when Officer Ferretti asked defendant to step out of the car transformed the encounter into an unreasonable seizure violative of his Fourth Amendment rights.

When Officer Ferretti arrived at the stopped vehicle, he observed Officer Thayer escorting Darlene Baker from the blue Toyota toward Thayer's cruiser. Officer Ferretti left his vehicle and approached the blue Toyota on foot. As he neared the driver's side of the car, he observed the back seat passenger "bent over" and "stuffing something between the seat and the back of the seat." When he arrived at the door on the driver's side, he observed defendant seated in the front passenger seat and a man fitting the description of Alvarez seated in the back, behind the driver's seat. The officer asked both men to exit the car, which they did. Defendant argues that this intrusion was not justified.

■ On the facts of this case Officer Ferretti could have concluded that Officer Thayer was detaining the female driver and he observed the movement by the back seat passenger which suggested an effort to remove, or to conceal, an unidentified object. These facts alone permitted the Superior Court to infer that the officer's request that the passengers step from the car was justified by a concern for safety. The Superior Court did not err in holding

---

**5.** Defendant's reliance on our prior decision in *State v. McKenzie,* is misplaced. There the informant conveyed to the police only her hunch that something was suspicious. Here the informant conveyed all of the factual information which gave rise to his suspicion.

that the request to exit the car did not constitute an unreasonable seizure.

## IV

The Superior Court denied defendant's motion to suppress the contents of two boxes found in the passenger areas of the car. We discern no error in that ruling.

■■■ After defendant and Alvarez stepped from the car, Officer Ferretti observed a brass pipe and the butt of a hand-rolled cigarette in plain view on the dashboard. He also observed what appeared to be marijuana seeds on the back seat. His observations under these circumstances do not constitute a search. *State v. Rusher,* 468 A.2d 1008, 1011 (Me.1983); *State v. Harriman,* 467 A.2d 745, 748 (Me.1983); *State v. Sapiel,* 432 A.2d 1262, 1266 (Me. 1981). Officer Ferretti testified, on the basis of extensive police experience, that the cigarette and pipe contained marijuana residue. He arrested both men for possession of a controlled substance.[6] As he entered the automobile to confiscate the cigarette, pipe, and seeds, he observed two open boxes—one in the front passenger area and one in the back—which revealed numerous pocket watches, coins, jewelry, and pieces of silver. Defendant asserts that the officer's observation of the contents of the open boxes was a search. He argues that this "warrantless search" exceeded the scope of the automobile exception recognized in *State v. Patten,* 457 A.2d 806 (Me.1983) and *State v. Bouchles,* 457 A.2d 798 (Me.1983). The officer's observation of the visible contents of the open boxes does not, however, constitute a search where the officer was justified in being at his place of observation. *State v. Rusher,* 468 A.2d at 1011; *State v. Harriman,* 467 A.2d at 748; *State v. Sapiel,* 432

A.2d at 1266. Having arrested defendant and Alvarez for possession of marijuana which was in plain view, Officer Ferretti was legitimately present in the vehicle to confiscate the contraband. The Superior Court did not err in holding that the observation of the contents of the boxes during the confiscation of the marijuana was not a search.

## V

■■■ At trial, the Superior Court refused to permit defense counsel to impeach the testimony of the owner of the allegedly stolen goods by introducing evidence of the owner's prior conviction for aggravated assault and criminal threatening with a dangerous weapon. The presiding justice held the convictions to be inadmissible on two grounds. First, he ruled them inadmissible because the convictions were on appeal and therefore subject to reversal. Second, relying on M.R.Evid. 609(a) he concluded that the convictions would be more prejudicial than probative in value. On both grounds the court erred.

In *State v. Dunn,* 370 A.2d 1099, 1101 (Me.1977) we held that a prior conviction includes a conviction in which an appeal is still pending. Although our decision in *Dunn* involved a statute which was later replaced by Rule 609(a), no reason has been advanced to support the assignment of a different meaning to the nearly identical wording of the rule. The second basis for finding the convictions inadmissible is equally flawed. We have previously noted that it is an open question whether Rule 609(a)[7] exclusively controls the admissibility of evidence of prior convictions to impeach a prosecution witness, or whether

---

6. In Massachusetts possession of any quantity of marijuana is a criminal offense.

7. M.R.Evid. 609(a) states:
   For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime is admissible but only if the crime (1) was punishable by death or imprisonment for one year or more under the law under which he was convicted, or (2) involved dishonesty or false statement, regardless of the punishment. In either case admissibility shall depend upon a determination by the court that the probative value of this evidence outweighs the prejudicial effect to the defendant.

Rule 403 [8] may be used as a basis for exclusion. *State v. Trafton,* 425 A.2d 1320, 1324 (Me.1981). In relying on Rule 609 and finding that the evidence of prior convictions would be more prejudicial than probative, the Superior Court disregarded the fact that the rule refers only to prejudice *to the defendant.* Clearly, in the present case, defendant would not have been prejudiced in any way by impeachment of the complaining witness. The question whether Rule 403 could have been utilized to reach the same result is not before us. It is sufficient to note that any prejudice to the state is not so glaring as to permit the conclusion that the trial justice would have abused his discretion if he admitted the evidence over an objection based on that rule. The conclusion is inescapable that the trial justice erred in excluding evidence of the prior conviction of the state's witness. Now we must inquire whether the error was nevertheless harmless.

Defendant argues that the exclusion of the prior convictions could not be viewed as harmless error because the witness provided the only evidence offered by the state to prove the value of the items alleged to have been stolen. The indictment specified that defendant obtained property having an aggregate value of $18,302.50, consisting of 49 pieces of jewelry having a value of $5,532.50, 65 watches having a value of $8,753.00, sterling silver flatware having a value of $3,329.00, one ivory elephant tusk having a value of $475.00, and 8 additional pieces of ivory having a value of $215.00. In conformity with 17–A.M.R.S.A. § 353 the indictment, however, alleged only that the value of the stolen property exceeds the minimum $5,000.00 required for a Class B Theft. Each item of property was introduced into evidence and the owner testified in significant detail as to the purchase price and value of the individual items. The jury had full opportunity to view all of the items

of property and to determine whether the value of the property exceeded $5,000.00. Whether we employ the standard adopted by this Court in *State v. True,* 438 A.2d 460, 467 (Me.1981), or the more exacting standard required for errors of constitutional dimension, we have no difficulty in concluding beyond any reasonable doubt that the error did not affect the judgment. The extent of the value in excess of the required $5,000.00 evidences the fact that a different result would not have obtained even if the evidence of prior convictions had been admitted.

## VI

■ Defendant next argues that the Superior Court erred in refusing to grant a new trial on the basis of improper argument on the part of the prosecution. At trial portions of a transcribed statement of the defendant were read into evidence by a witness. The transcript itself was not admitted into evidence. During closing argument, the prosecutor referred to the statement in evidence and read exerpts from a copy of the transcript. Defendant argues on appeal that the jury may have believed that this reading constituted "evidence" and thus it was error for the Superior Court to deny his motion for new trial.

■ To prevail defendant must establish that he was prejudiced by the prosecutor's reading of the transcript in argument. *See State v. Lyons,* 466 A.2d 868, 871 (Me. 1983); *Cates v. Farrington,* 423 A.2d 539, 541 (Me.1980); *Daigle & Son, Inc. v. Stone,* 387 A.2d 1115, 1116–17 (Me.1978). We note that the presiding justice instructed the jury that the closing statements by the attorneys were not evidence. Defendant does not argue, nor does the record suggest, that the prosecutor did anything more than accurately repeat the evidence

---

**8.** M.R.Evid. 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

which had been admitted.[9] We are not persuaded that the trial justice erred in denying defendant's motion for new trial.

The remaining issues presented on appeal are without merit and require no discussion.

The entry shall be:

Judgments of conviction affirmed.

All concurring.

---

9. We disapprove of the practice of counsel seeking to enhance their credibility before the jury by including verbatim accounts of portions of the trial testimony in closing argument. Car-

ried to its extreme, such a practice could lead to unnecessary difficulty and delay in the trial proceedings and serves no useful purpose.