STATE OF MAINE
KENNEBEC, ss.

UNIFIED CRIMINAL DOCKET
AUGUSTA
DOCKET NO. CD-CR-19-377

STATE OF MAINE

v.

**ORDER ON DEFENDANT'S
MOTION TO SUPPRESS**

CHRISTOPHER VARGAS,
    Defendant

This matter came before the undersigned on November 1, 2019 with respect to the Defendant's Motion to Suppress[1]. After hearing, and after having had the opportunity to review the applicable caselaw and post-hearing memoranda of counsel, the Court enters this **Order** based upon the Findings of Fact and Conclusions of Law set forth below:

**I. Findings of Fact:**

1. Law enforcement officer David Ames (hereinafter "Ames") has over 30 years of law enforcement experience. On 2/19/19 Ames was working in his capacity at the time as a Maine Drug Enforcement Agency "special agent."

2. Ames received a call from a confidential informant (hereinafter "CI") at approximately 10:30 a.m. that day. The informant told Ames that there was a Hispanic male at 24 Elm Street, Apt. 105, Waterville, Maine that was in possession of a large quantity of heroin, fentanyl, and cocaine base. This male was known as "H."

3. Ames had known this particular CI since 2013. Ames had used the CI in the past and had found the CI to be "very reliable."[2]

---

[1] The Court noted at the outset of the hearing that the issues for the Court to determine were the legality of the "stop" of Defendant that occurred on 2/19/19 as well as whether the actions taken by law enforcement after the stop "exceeded the scope of the stop."

[2] Ames characterized the previous information provided by the CI to be "spot-on" and had resulted in criminal charges being brought against those involved.

4. Ames through his contacts with the Waterville Police Department knew that the apartment in question was rented by one Marie Barton. Ames had not had any previous law enforcement experience with Ms. Barton.

5. The CI advised there was a second Hispanic male involved known as "Carlos" who was staying at the Hampton Inn in Waterville, Maine and drove a black Toyota 4-Runner with New Jersey registration plates. The CI provided Ames with the registration plate number of the vehicle. The CI stated that "Carlos" was also in possession of a large quantity of illegal drugs, and that "Carlos" and "H" were in the business of selling drugs together.

6. Based on the information provided by the CI, Ames notified other law enforcement officers to assist Ames, notified his supervisor of what the CI has told Ames, and drove to the Hampton Inn towards the rear parking lot area of the hotel. There, Ames observed a black Toyota 4-Runner with New Jersey license plates that matched the information provided by the CI.

7. Ames continued to have "regular" communication throughout the day and evening with the CI. The CI informed Ames by cellphone that "at some point" during the day "Carlos" was going to be contacting the CI to go pick up "Carlos" at the Hampton Inn and transport "Carlos" to the Elm Street address where "H" was staying.

8. After receiving the above information, Ames was told that CI was observed leaving the Elm Street address. Ames called the CI and personally met with the CI. The CI informed Ames that the CI was going to go pick up "Carlos", that they planned on going through a fast food drive-thru to pick up food for "Carlos", and then the plan was to bring "Carlos" back to the Elm Street address. Ames followed the CI, and observed CI drive to the Hampton Inn, pick up a male, drive to Burger King, go through the drive-thru, and then proceed to the Elm Street address and park.

9. Law enforcement continued their surveillance. Eventually the CI contacted Ames again and informed him CI was going to be providing a ride to Augusta to an unknown apartment to "Carlos".

10. At approximately 7:00 p.m. another law enforcement officer observed the CI and another male subject leave Elm Street in CI's vehicle and proceed towards the Hampton Inn. Ames picked up the surveillance and observe the vehicle proceed to the Hampton Inn. The male passenger exited CI's vehicle, went over to the aforementioned 4-Runner, got into the vehicle, then exited the vehicle, and got back into CI's vehicle.

11. The vehicle drove down the street and entered into a gas station parking lot, where the CI exited and walked into the store. CI then called Ames and advised him that "Carlos" was in the vehicle with the CI and possessed illegal drugs. A plan was developed to stop the vehicle once it passed over the bridge connecting Waterville to Winslow and turned right onto Route 201 towards

2

Augusta. Maine State Trooper Derrick Record (hereinafter "Record") who had a "canine unit" dog certified to detect narcotics with him was going to make a traffic stop of the vehicle.

12. Ames told the CI of the plan and informed the CI Ames would "secure" the CI in another officer's vehicle once the vehicle was stopped.

13. The 4-Runner was stopped. The dog reacted as if narcotics were in the vehicle, but a search resulted in no narcotics being found. Ames advised the CI of that, who replied that "Carlos" had stuffed the drugs down in his pants as he and the CI were leaving the apartment to travel to Augusta.

14. Ames advised Record that the drugs were in the groin area of "Carlos." Record replied that the dog had "hit" on "Carlos's" groin area as having drugs in that area. An "ID" on "Carlos" identified him as the Defendant Christopher Vargas. The dog had, however, falsely "alerted" three times to the presence of drugs in the vehicle. This was explained by Ames as evidence that drugs had previously been in the various locales that the dog had "alerted" to.

15. The Defendant was searched and no drugs were found on him. Ames asked the Defendant if he was willing to give up the drugs suspected on him. The Defendant replied that no drugs were on him, whereupon Ames took the Defendant to the Waterville Police Department. One Percocet pill was found on the Defendant at the station. Later, while Ames and Defendant were in the bathroom for purposes of a further search of Defendant's person, Defendant told Ames that "I'm giving you what I got" and gave a package containing cocaine base and fentanyl to Ames. (The substance field-tested positive for these drugs.)

16. Officer Nathan Walker (hereinafter "Walker") also testified at the Motion to Suppress, confirming that Ames had contacted Walker on 2/19/19 and informed him of the above suspected drug activity, whereupon Walker began a surveillance operation of the Elm Street address. Walker observed significant pedestrian traffic to and from the apartment that according to the officer can be indicative of drug activity.

17. Eventually Walker was involved in the stopping of the vehicle in question. Walker patted down the Defendant once he exited the vehicle and found no weapons.

## II. Conclusions of Law:

18. To justify an investigatory stop of a moving automobile, law enforcement must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant suspicion of criminal conduct on the part of the occupants. *State v. McKenzie*, 440 A.2d 1072, 1075 (Me. 1982). An informant can be the source of facts supporting a limited *Terry v. Ohio*-type stop as long as the information provided to law enforcement carried enough indicia of reliability to justify a stop. *State v. Hasenbank*, 425 A.2d 1330, 1331 (Me. 1981). Information supplied by a known informant can provide a

3

stronger case for law enforcement than other fact patterns such as an anonymous telephone tip. *Id.*

19. The undersigned finds ample justification for stopping the vehicle in question here. Law enforcement had information provided by a known informant who was considered to be "very reliable" that two individuals had large quantities of illegal drugs in their possession and that there was going to be a drug deal in the City of Augusta later that day. Information concerning the general appearance of the individuals as well as information concerning the vehicle to be used all was confirmed by law enforcement. There was observed significant pedestrian traffic to and from the apartment in question that could be evidence of drug activity. This was not a situation where the informant had a "hunch" that criminal activity was occurring or about to occur, such as was the case in *McKenzie, supra.*

20. Defendant argues that, even if the stop of the vehicle could somehow be considered legal, law enforcement immediately arrested the Defendant, that the arrest was without probable cause, and that as a result "the fruits of the stop and searches should be suppressed, and the matter should be dismissed." Defendant's Memorandum of Law dated 11/1/19 at page 10.

21. The undersigned finds that Defendant was arrested at the scene of the stop by law enforcement; accordingly, the question then becomes whether there was probable cause to arrest the Defendant. Probable cause to arrest exists when facts and circumstances within the knowledge of law enforcement and of which they have reasonably trustworthy information would warrant a prudent and cautious person to believe that the arrestee did commit or was committing a crime. *State v. Parkinson*, 389 A.2d 1, 8 (Me. 1978). Although requiring more than mere suspicion, probable cause to arrest can be satisfied on less than the quantum of proof necessary to establish a fact by a fair preponderance of the evidence. *State v. Flint*, 2011 ME 20, ¶ 12; *See also Texas v. Brown*, 460 U.S. 730, 742, 75 L. Ed. 2d 502, 103 S. Ct. 1535 (1983) ("probable cause is a flexible, common-sense standard ... [that] does not demand any showing that [the officer's] belief be correct or more likely true than false").

22. The undersigned finds ample facts and circumstances within the collective knowledge of law enforcement present at the time of Defendant's arrest to justify the arrest. Ames had detailed, nearly "in real-time" information relayed to him both by phone as well as in person from the CI that criminal activity was afoot. Although somewhat dated, Ames had previous experience with the CI that caused Ames to describe the CI as "highly reliable." Some of the information provided by the CI was independently corroborated by other law enforcement personnel. The "drug dog" "alerted" to the presence of narcotics where no drugs were found: this can be explained by either the dog was simply wrong, as defense counsel would have the Court find, **or** by the fact that drugs had been in the area where the dog alerted, but had subsequently been moved, as the State would explain the dog's actions. The dog also "alerted" to that area of the Defendant's body that the CI contended the Defendant had put the drugs before being apprehended by law enforcement.

4

23. For the reasons set forth above, the Court finds no constitutional infirmities present with the conduct of law enforcement in this matter, and thus **denies** the Defendant's Motion to Suppress.

Date: 12/31/19

BY _____

Robert E. Mullen, Deputy Chief Justice
Maine Superior Court

Entered on the docket  1-3-20

5