STATE of Maine

v.

Charles GRIFFIN III.

Supreme Judicial Court of Maine.

Argued March 7, 1983.

Decided April 27, 1983.

 

Michael E. Povich, Dist. Atty., Ellsworth, Wayne S. Moss, Asst. Atty. Gen. (orally), Augusta, for plaintiff.

Sophie Spurr (orally), Blue Hill, for defendant.

Before McKUSICK, C.J., GODFREY, NICHOLS, CARTER and WATHEN, JJ., and DUFRESNE, A.R.J.

DUFRESNE, Active Retired Justice.

The defendant, Charles Griffin III, was convicted of operating a motor vehicle while under the influence of intoxicating liquor, 29 M.R.S.A. § 1312(10) (1979), operating after being adjudicated an habitual offender, 29 M.R.S.A. § 2298 (Supp.1982–83), assault, 17–A M.R.S.A. § 207 (1983), and escape, 17–A M.R.S.A. § 755 (1983), all in a consolidated jury trial in the Superior Court (Hancock County). The charges grew out of an incident in the Town of Hancock during the early morning hours of June 7, 1981. On appeal, the defendant claims (1) that the arresting officer's initial "investigatory stop" of the defendant was unlawful; (2) that there was insufficient evidence before the jury to support its guilty findings on any of the four charges; and (3) that the trial court erred in instructing the jury on the elements of escape. We find no merit in any of these claims, and accordingly we affirm the judgments of conviction.

The State at trial presented two witnesses, George Robinson II, the arresting officer, and another member of the Sheriff's Department in the County of Hancock, while the defendant himself took the stand and testified in his own behalf, supported in his testimony by his female companion at the time that it was his brother, Peter Griffin, who was driving his car.

Our review of the record indicates that the jury would have been warranted in finding the following facts. Charles Griffin III attended two wedding receptions on June 6, 1981, and from 3:00 o'clock that afternoon to the time he left the last party in the Town of Franklin he had consumed, by his own estimate, a "fifth" of hard liquor, two six-packs of beer, and some champagne. The defendant admitted that he was "very intoxicated" by the end of the festivities. At 2:00 o'clock on the morning of June 7, Deputy George Robinson II noticed a small blue car pull over to the side

of route 182 in the Town of Hancock and come to a stop behind a van already parked there. The deputy observed nothing unusual about the manner in which the car itself was being operated. When he brought his marked patrol car even with the stopped small automobile, prior to making a left turn to leave route 182, he glanced across at the blue car and saw two people in it, both in front. The officer then noticed the male person in the driver's seat, upon looking back at him, slide between the two front seats and into the car's rear seat. On leaving the police cruiser and approaching the blue car to investigate, Deputy Robinson saw a female occupant exit from the passenger side of the vehicle. He identified the male occupant, then in the back seat, as Charles Griffin III. Griffin was asked for his license and registration but produced only the latter, saying that he didn't need a driver's license, because he wasn't driving. Asked to get out of the car and accompany the officer to the cruiser, Griffin readily complied, but Robinson noticed that the defendant's speech was slurred, he was staggering as he walked, and his breath smelled of alcohol. The deputy radioed the Sheriff's Office and learned that Griffin was an habitual offender.[1] At that point, Griffin was asked to come out of the cruiser, and he did. The officer then told Griffin that he was being placed under arrest for operating under the influence and for operating after being adjudicated an habitual offender. Griffin concedes that the officer then caused him to turn toward the police car and place his hands on the roof while the deputy frisked him. He further got the defendant to put his hands behind his back and it is at that moment when the officer attempted to put handcuffs on him that a scuffle ensued. "He was applying pressure, really twisting my arm in back of me," Griffin said of the officer, "and at that point I pulled myself through." Robinson stated that the defendant struck him with

---

1. Griffin's license had been revoked by the Secretary of State on August 14, 1980; the revocation was still in effect on June 7, 1981.

both arms and knocked him sideways, that in response thereto, he swung his flashlight striking the defendant in the shoulder and head. The scuffle was brief and the defendant broke away and ran out of the officer's sight. Some minutes later, Griffin returned to the vicinity of the blue car, and Deputy Robinson, with the help of another Sheriff's deputy, eventually managed to place the defendant in handcuffs and transport him to a local hospital and then to the Sheriff's Office.

## I. *The Investigatory Stop.*

In order to initiate an investigation involving brief detention short of a formal arrest, a law enforcement officer must act on the basis of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," *Terry v. State of Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968). The basis for the investigatory stop need not amount to probable cause for an arrest. *State v. Babcock,* 361 A.2d 911, 914 (Me.1976); *State v. Rand,* 430 A.2d 808, 819 (Me.1981). In fact, the observed conduct giving rise to the officer's suspicion of criminal activity may be wholly lawful in itself. *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980).

But, as in the case of probable cause for arrest, the standard to be used to assess the constitutional sufficiency of the factual basis underlying a Terry-type temporary stop or detention of an individual must be an objective one: would the facts available to the officer at the time of the stop or detention, when viewed in their totality, "warrant a man of reasonable caution in the belief" that the existing specific and articulable facts do give rise to a reasonable suspicion of criminal activity and that an investigatory temporary stop or detention of the individual is appropriate to clear up the suspicion? *See Terry v. State of Ohio,* 392 U.S. at 21–22, 88 S.Ct. at 1880. And, in the application of this objective standard to the particularized facts of the situation at hand, one must necessarily anticipate and accept that reasonable mistakes will creep in at times. *See State v. York,* 324 A.2d 758, 763 (1974).

The Fourth Amendment to the United States Constitution and Article I, Section 5 of our Maine Constitution do require that the officer's objective observations, coupled with any relevant information he may have, together with the rational inferences and deductions he may draw and make from the totality of the circumstances, be sufficient to "reasonably warrant suspicion of criminal conduct" on the part of the party or parties subjected to the investigatory stop or detention, criminal conduct which has taken place, is occurring, or imminently will occur. *See State v. Rowe,* 453 A.2d 134, 136–37 (Me.1982).

The central thrust of the constitutional guarantee against unreasonable searches and seizures is to protect the privacy interest of individuals against intrusive incursions of agents of government, including the police. The place where the intrusion occurs is not the controlling determinant of the constitutional prohibition (*State v. Philbrick,* 436 A.2d 844 (Me.1981); *State v. Rand,* 430 A.2d 808 (Me.1981)) and Griffin had a legitimate expectation of privacy, whether he was traveling on foot on a public street or, as in the instant case, was seated in his automobile parked on the street at the time. The constitutional limitations embodied in the Terry-type temporary investigatory stop or detention of person or property apply, whether the motor vehicle is in motion or at rest. *See United States v. Walling,* 486 F.2d 229 (9th Cir. 1973).

Furthermore, it is within the reasonable scope of an investigatory stop or detention for the officer to ask as he did in this case the defendant Griffin, the suspect person, to come out of his car and join him in the police cruiser to answer questions. Such police request and submission thereto are not to be equated to an arrest. *See State v. Kelly,* 376 A.2d 840, 847 (Me.1977). This is proper detective strategy, which not

only enables law enforcement officers to better judge the suspect's demeanor and better appraise his answers given in the course of the investigation, but also fosters the self-evident protection interest of the officer in the suspect's removal from any readily available weapon that might be in the car. *United States v. Harflinger,* 436 F.2d 928, 933 (8th Cir.1970). *Cf. Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

 Deputy Robinson initiated his "investigatory stop" by walking over to the defendant's automobile and asking him to produce his license and registration. The officer's sole basis for this temporary invasion of the defendant's privacy rights, the State concedes, was Griffin's furtive behavior consisting of his sliding from the driver's seat to the rear seat of the recently-stopped automobile immediately on realizing that he was being observed by a law enforcement officer in uniform in a marked patrol car. In rural Maine, where there is no history of institutionalized fear of the police on the part of the civilian population, furtive behavior or actions suggesting that the subject does not want to be seen by the police at a particular time or place may furnish a rational foundational basis for an officer's reasonable suspicion that the subject is involved in unlawful conduct. Officer Robinson who had just seen the driver of the parked car slide into the back seat on the officer's observation of him had reasonable grounds to suspect a violation of the motor vehicle laws of the State and, as we said in *State v. Fitzherbert,* 361 A.2d 916, 920 (Me.1976), it was reasonable for him to undertake a brief and limited investigation and explore, without searching, the significance of the driver's furtive conduct.[2] 3 W. LaFave, *Search and Seizure* § 9.3, at 73–75 (1978). *See State v. Darling,* 393 A.2d 530, 532 (Me.1978); *State v. Johnson,* 365 A.2d 497, 498 (Me.1976). *See also Hawkins v. State,* 543 S.W.2d 606, 609–10 (Tenn.Cr.

App.1976), where the furtive conduct of the driver of the car consisted in driving out of a field at about 2:00 a.m. at a rapid pace on the police car's approach to investigate; *People v. Lee,* 41 Ill.App.3d 502, 354 N.E.2d 543 (1976), where the furtive conduct of the driver of the car observed by police as it was leaving the area in looking back towards the store that had just been held up and on the officer's signal to stop for identification purposes, instead of complying with the request, accelerating the speed of his car and passing stop signs and a stop light without stopping in his effort to get away. In both cases, the totality of the circumstances justified a reasonable belief on the part of the police that the respective defendant was involved in criminal activities.

## II. *The Evidence*

The defendant questions the sufficiency of the evidence to support his conviction beyond a reasonable doubt in the case of each of the four criminal charges brought against him. None of his claims is meritorious.

### A. *Operating under the influence*

 First, Griffin contends that Officer Robinson's admission that he saw nothing wrong with the defendant's actual driving of the car and had no indication as he observed the vehicle that the driver's ability to operate was impaired, absolutely precludes conviction of the crime of operating while under the influence of intoxicating liquor under 29 M.R.S.A. § 1312. The statute in effect at the time of Griffin's arrest (§ 1312, sub-§ 10–A) provided in pertinent part as follows:

> Notwithstanding the provisions of Title 17–A, section 4–A, any person who, while under the influence of intoxicating liquor or drugs, operates or attempts to operate a motor vehicle within this State shall be punished . . . (*See* P.L.1979, c. 422, § 2).

---

**2.** We note that the defendant's objection to Deputy Robinson's investigation was never made at trial by a suppression motion or otherwise. Thus, even if the investigatory stop had

not been lawful, we would overturn Griffin's conviction only if we were convinced that it was "obvious error" for the trial justice to admit evidence gained as a result of the stop.

The legislative intent underlying the statutory prohibition against the operation of motor vehicles while under the influence of intoxicating liquor demonstrates a broad design of protection for every person lawfully on the highways of the State. Our Court has recognized this and has applied a liberal interpretation to the statutory terminology

—operating while under the influence—

and not the narrow construction which the defendant is now seeking. It is the driver whose mere physical and/or mental condition evinces a present after-effect from the use of intoxicants who is prohibited from operating, and not necessarily only the driver whose intoxicated condition results in an erratic operation. That condition which brings a driver within the broad scope of the operating-under-the-influence statute is not only a lessening of his mental alertness, or an exhilaration thereof, but as well any weakening or slowing up of the action of his motor nerves, any interference with the co-ordination of sensory and motor nerves, which may cause sluggishness where quickness of action is demanded. *State v. Taylor,* 131 Me. 438, 441, 163 A. 777, 778 (1933); *State v. Mann,* 143 Me. 305, 312, 61 A.2d 786, 789–90 (1948). When the statute carried the terms "when *at all* under the influence of intoxicating liquor," it was deemed unnecessary to determine whether that influence adversely affected the operator's driving ability. *See State v. Bean,* 430 A.2d 1109, 1110 (Me.1981). And, in *Bean,* we viewed the series of amendments to the operating-under-the-influence statute, even though the so-called magic words "at all" were dropped, as strengthening the Legislature's early conclusion that the public must be protected against persons who drive under the influence of intoxicating liquor regardless of the extent of that influence. *Id.* at 1110 and note 1 thereon.

Deputy Robinson testified that the defendant was behind the wheel of the blue car immediately after it came to a stop; this evidence was sufficient to support the jury's conclusion beyond a reasonable doubt that Griffin had been operating the vehicle. The officer's further testimony about the defendant's condition after he was out of the car, together with Griffin's own statements on the stand as to the quantity of alcohol he had consumed over the preceding eleven hours, was ample proof for the jury's conclusion that the defendant was "under the influence" of intoxicating liquor while operating the car.

### B. Operating during habitual offender status

Griffin's claim that there was not sufficient evidence to support his jury conviction of operating a motor vehicle after being adjudicated an habitual offender under 29 M.R.S.A. § 2298 is equally without any merit.

### C. Assault

The assault statute, 17–A M.R.S.A. § 207(1), states that "[a] person is guilty of assault if he intentionally, knowingly, or recklessly causes bodily injury or offensive physical contact to another." Under 17–A M.R.S.A. § 2(5), the words "bodily injury" are given the meaning of "physical pain, physical illness or any impairment of physical condition." Thus, the statutory definition of assault under the Maine Criminal Code in its minor aspect pursuant to section 207 bifurcates the crime into two separate varieties of unlawful conduct, 1) conduct causing only an offensive physical contact to another, such as the knowingly intended bodily contact or unlawful touching done in such a manner as would reasonably be expected to violate the person or dignity of the victim (*State v. Worrey,* 322 A.2d 73, 81 (Me.1974)) and 2) the knowingly intended use of unlawful force against another causing bodily injury as statutorily defined. We did recognize this difference in *State v. Carmichael,* 405 A.2d 732, 734 (Me.1979). In the instant case, Officer Robinson suffered both skinned knees and a violation of his dignity as a result of the defendant's violent outburst.

The evidence sustains either aspect of the charge and is sufficient to support beyond a reasonable doubt the defendant's conviction of the crime of simple assault arising from one single criminal episode. The scratching and bruising of his knees as testified to by Officer Robinson, on the one hand, was sufficient proof to a fact-finding jury of the defendant's intentional and knowing infliction of non-serious bodily injury creating physical pain within the scope of 17–A M.R. S.A. § 207, whether viewed alone or in connection with the unlawful offensive physical contact aspect of such evidence. On the other hand, Officer Robinson expressly stated that he "felt offended" by the defendant's physical misbehavior. Under the circumstances, it became a jury question whether under the specific circumstances proved the defendant subjected the officer to offensive physical contact, applying an objective standard—whether a reasonable person of ordinary sensitivities would regard the particular contact in the case as offensive physical contact. *State v. Bushey,* 425 A.2d 1343, 1346–47 (Me.1981), quoting with approval, *State v. Keller,* 40 Or. App. 143, 594 P.2d 1250, 1252 (1979). As stated in *State v. Austin,* 381 A.2d 652, at 655 (Me.1978), under the Maine Criminal Code

> a person being arrested must not respond violently.

> \*　　\*　　\*　　\*　　\*　　\*

The legislature has . . . cast the advantage on the side of law enforcement officers, leaving the person arrested in most cases to pursue his rights, not through violent self-help, but through prompt hearing before a magistrate with prompt consideration for release on bail or personal recognizance. (footnote omitted).

#### D. *Escape*

 The evidence in the instant case would have supported a jury finding that, prior to his breaking away from the officer, Griffin had been (1) told that he was under arrest, (2) taken by the arm, (3) frisked, and (4) caused to put his arms behind his back.

It is for leaving the custody of Officer Robinson who at this point was attempting to put the handcuffs on Griffin that the defendant was charged with escape. Section 755(1), of 17–A M.R.S.A. provides that a person is guilty of escape, if, without official permission, he intentionally leaves official custody. Section 755(3) defines "official custody" as including "arrest."

The defendant contends that he was not effectively under arrest at the time he broke away from Officer Robinson, so that the charge of escape was premature as a matter of law. We disagree.

 There are four elements to an arrest in Maine: (1) an intention on the part of the arresting officer presently to make the arrest; (2) a communication of that intention to the prospective arrestee; (3) an understanding of that intention by said prospective arrestee; and (4) "the actual or constructive seizure or detention of the person to be arrested by the one [officer] having the present power to control him." *State v. Daley,* 411 A.2d 410, 411 (Me.1980) (quoting *State v. Powers,* 386 A.2d 721, 727 (Me.1978)). As pointed out in *Powers,* to constitute an arrest, there must be *either* a physical seizure of the person by the arresting officer *or* a submission to his authority and control. Although the defendant argues that he never "submitted" to the deputy's authority, the evidence clearly would support the jury's conclusion that the defendant's arrest had been effected by a physical seizure. The fact that Griffin ultimately managed to break away from the deputy cannot necessarily mean that there was no arrest; otherwise, the escape itself would negative the arrest and make it logically impossible for anyone to be convicted of escape from arrest.

### III. *The Jury Instructions.*

 The trial justice in this case correctly charged the jury that it could not find the defendant guilty of escape unless it found that he had been under arrest at the time. The Justice continued,

An arrest involves limitation of physical movement and indication to the person arrested that he is, in fact, under arrest.

"Limitation of physical movement" was further explained as "touching, or an attempt to impose limitations of physical movement which involves a touching . . . ." In confining the charge to these generalities, the Justice failed to inform the jury in more detail that the "seizure" element of an arrest may be satisfied by *either* a "touching" (physical seizure) *or* a submission by the arrestee to the officer's authority.

The deficiency in the charge, however, was harmless, as the giving of the more particularized instruction in the instant case could only have made a guilty verdict more likely. Besides, defense counsel explicitly told the trial justice that he had no objection to the instructions as given. The defendant certainly suffered no "manifest injustice" on account of these instructions, and his conviction, therefore, will stand.

The entry is:

Judgments of conviction affirmed.

All concurring.