STATE of Maine

v.

**Robert O. GARLAND.**

Supreme Judicial Court of Maine.

Argued March 9, 1984.
Decided Sept. 6, 1984.

**140**

Paul Aranson, Dist. Atty., Laurence Gardner (orally), Asst. Dist. Atty., Portland, for plaintiff.

Bourque & Clegg, Kenneth R. Clegg (orally), Sanford, for defendant.

Before McKUSICK, C.J., and ROBERTS, VIOLETTE, WATHEN, and GLASSMAN, JJ., and DUFRESNE, A.R.J.

DUFRESNE, Active Retired Justice.

The defendant, Robert Garland, appeals from a judgment of conviction entered against him in the Superior Court (Cumberland County) after a jury-waived trial for driving while a habitual offender, a Class C crime under 29 M.R.S.A. § 2298 (Supp. 1983–1984). Garland argues that the evidence of his habitual offender status was obtained as a result of an illegal seizure and detention of his person and should have been suppressed as requested by motion. We agree and reverse the judgment of conviction.

## I

The factual scenario within which the suppression issue must be decided is not in dispute and reveals the following happenings. On June 7, 1982, at approximately 6:40 p.m., Officer James Langella, a seven-year veteran of the Cumberland County Sheriff's Department, was traveling north on Route 100 between Gray and Lewiston in the vicinity of the intersection of Legrow Road when he made certain observations. Uncertain, so he testified, whether he was driving a marked cruiser or whether he was in uniform, he stated that he was traveling at approximately thirty-five (35) miles per hour when, as he passed the intersection of Legrow Road, he noticed a vehicle being operated *very slowly* on another road which connected with the Legrow Road. He qualified this by saying, however, that the vehicle was not being driven erratically. The officer conceded that he was unfamiliar with the area and generally considered the road like any other country road. His observation was made during the space of three to four seconds and at a distance of some fifty to sixty feet away. Being suspicious on account of the slow operation of this vehicle, Officer Langella turned around and proceeded toward the intersection for further

investigation. On his third sighting, Langella saw the car stop in the middle of the road and a male occupant exit from the driver's side. This person then stood in the roadway with his right arm in such position that the officer thought he might have a gun in his hand. Langella then left Route 100 in the direction of this car and as he pulled up to it he saw the man zip up his pants, but did not see any gun in his hand. The officer under oath said:

I though he had a gun in his hand and I was mistaken. He showed me what he had in his hand .... Nothing.

Langella confirmed on arrival that the man had been urinating, but did not see any reason for his urinating in the street with so much wood in the area, especially with a young female in the car.

Officer Langella got out of his car and walked over to Garland and asked him for identification. Garland produced a valid driver's license from the State of Tennessee, so Langella stated, and the officer was shown a valid registration of the motor vehicle in the name of the passenger's mother, a Maine resident. Langella had Garland sitting in the officer's car while he communicated with his dispatcher to find out if there were any warrants out for Garland's arrest. As stated in his testimony at the suppression hearing, Langella was suspicious:

"a man from Tennessee that would be on Legrow Road urinating, following coming out of a driveway or unknown road, with a young female. He is from Tennessee with a young female in Gray, Maine."

Langella was advised that there were no warrants of arrest outstanding against Robert Garland, but that he was a habitual offender in Maine. The officer then informed Garland that he was under arrest for driving while a habitual offender. He further told Garland that he never would have stopped him, had Garland gone into the woods to urinate.

On October 12, 1982, Garland moved to suppress all evidence obtained as a result

of the stated stop. After hearing, the motion was denied, "there being a reasonable articulable suspicion to make inquiry," so found the presiding justice. The defendant was tried and convicted, and sentenced to a term of 60 days in the Cumberland County jail, execution of sentence to be stayed pending appeal.

II

The defendant has argued that, when he was initially accosted by Officer Langella and asked for identification, this was an unconstitutional seizure of his person and that all evidence obtained as a result of and during his unlawful detention should have been excluded at trial. We agree.

■ "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. State of Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). Officer Langella by asking Garland for identification, by reason of his authority as an officer of the law, effectively restrained the defendant's resumption of his journey and his driving away; this police action brought into play the protections of the Fourth Amendment against unreasonable seizures as applied to the states by the United States Constitution, Amendment XIV. Whether the seizure here in question was reasonable under the *Terry* exception to Fourth Amendment constrictions depends upon whether there were specific and articulable facts, which taken as a whole and together with the rational inferences from those facts warranted the police intrusion into the constitutionally protected privacy interests of the defendant. *See Terry v. State of Ohio,* 392 U.S. at 21, 88 S.Ct. at 1879; *State v. Bushey,* 425 A.2d 1343, 1345 (Me.1981).

■ The mere facts that Garland was not told at initial contact that he was under arrest and that he would not ultimately have been formally arrested if the requested check for outstanding warrants had proved completely fruitless did not remove Langella's investigatory stop of Garland

from the *Terry* requirements that the officer be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant suspicion of criminal conduct on the part of the party subjected to the investigatory stop or detention, criminal conduct which has taken place, is occurring, or imminently will occur. *Dunaway v. New York,* 442 U.S. 200, 212–13, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824, 836 (1979). Furthermore, to justify an investigatory stop of a person on foot on a public street as in the instant case, as well as of a moving automobile or one at rest (*see United States v. Walling,* 486 F.2d 229 (9th Cir.1973)), the officer's assessment of the existence of specific and articulable facts constitutionally sufficient to satisfy the *Terry* requirements must have an objective factual basis. See *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *State v. Griffin,* 459 A.2d 1086, 1089 (Me.1983); *State v. Dunlap,* 395 A.2d 821, 825 (Me.1978). In evaluating in an objective manner the varied facts available to the officer to determine whether there do exist "articulable reasons" and "founded suspicion" sufficient to suspect criminal activity on the part of the person to be investigated to support a constitutional investigatory stop, a law enforcement officer must take into account *all* of the circumstances in the assessment process. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

■ Investigatory stops for purposes of identification without any basis objectively founded on specific and articulable facts and inferences warranting reasonable suspicion of criminal conduct constitute unlawful seizures violative of Fourth Amendment prohibitions. *See Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Random stops of pedestrians or of drivers of motor vehicles while parked, as well as of moving automobiles, for purposes of identification and checking of drivers' licenses

and auto registrations, absent compliance with *Terry* requirements, are unreasonable under the Fourth Amendment.

## III

In this case, there is no dispute as to the underlying facts known to Langella. The appeal centers on what inferences Langella reasonably could draw from those facts. At the suppression hearing the officer offered a variety of justifications for his investigatory stop and detention of Garland and, on appeal, the State continues to press each of these grounds in support of the denial of the motion to suppress at the Superior Court level.

The first basis for the stop offered by Langella was that he thought Garland had a gun in his right hand. This concern arose from Langella's observations made at a substantial distance from a moving car. Garland had his back turned to Langella during the period of these observations. By the time Langella had driven up to Garland's car there was no doubt that Langella's original interpretation of what Garland was doing was mistaken. Langella's testimony that he continued to believe that Garland had a gun is totally without support in the record. There is no mention of any fact that would cause Langella to suspect Garland of possessing a gun after the time Langella had pulled up in his car behind Garland's auto.

A second asserted ground for suspicion is the possibility that Garland could be a burglar. This suspicion apparently stems from Garland's slow driving and Langella's belief that Garland may have pulled out of a driveway. Whether or not this suspicion may have justified Langella in driving up to Garland's car, there is no fact in the record to warrant this suspicion after the time Langella reached Garland's parked car. Langella never testified that, when he got to the car, he actually observed a driveway or residence in the area. Langella's unfamiliarity with the locale lends little or no credit to his unexplained belief that Garland had just pulled out of a driveway. It

strains credulity to suggest that a person would stop to urinate in the middle of the road immediately after burglarizing a nearby residence. Neither the time (6:40 P.M. during daylight) nor the presence of the female lend any affirmative support to a burglary theory. Langella did not testify that he was familiar with recent burglaries in the area. Garland's slow driving is obviously explained by his need to urinate. The officer's suspicion that a burglary had happened or was in the making was nothing more than the proverbial unsubstantiated hunch condemned in *State v. Wentworth*, 480 A.2d 751, 755 (Me.1984).

A third possibility, vaguely hinted at in Langella's testimony, is that Garland could have posed a danger to the girl. Langella testified that "as I come up, he is zipping up his pants, a young female is in the car. I don't know what is going on." The State pursues this point on appeal, but never explains what criminal activity is suggested by her presence. When Langella discovered the real reason Garland was zipping up his pants, any concern over a possible rape was dissipated. Nothing else in the record offers any basis for Langella to fear for the female's safety. Langella did not testify about any movements by the girl to escape from Garland, or to signal the officer as he approached, or to any other actions suggesting that the girl was anything but fully content to remain where she was.

A fourth possibility is Langella's suggestion that the car could be a stolen car. When asked why he suspected this, Langella said: "Due to his operation, the area it was in, the time of day, I had a suspicion but I had no real evidence." The slow driving on a country road is explained by Garland's need to urinate. In any event, Langella never suggested that, in his experience, a car driven slowly on a country road at 6:40 P.M. in daylight is any more likely to be stolen than is a car driven quickly on a city street at 6:40 A.M.

 Langella's concerns over the possibility that the girl was in danger or that the car was stolen are no more than inartic-

ulate hunches, utterly without factual support in the record, which the United States Supreme Court has consistently refused to sanction. *Terry v. State of Ohio*, 392 U.S. at 22, 88 S.Ct. at 1880; *State v. McKenzie*, 440 A.2d 1072, 1076 (Me.1982). The burglary and gun possession suspicions were founded entirely on subjective inferences which proved completely unrealistic when Langella pulled up in his car and discovered the reason Garland had been driving slowly and then standing in the road. The scope of a policeman's inquiry and the permissibility of continuing to press the on-going investigation necessarily depend upon the continuing flow of information coming to the officer's attention after the start of the originally undertaken investigation. If the officer discovers additional evidence of possible wrongdoing, he may expand his inquiry as suggested by this new information. *See State .v. Wentworth; State v. Fitzherbert*, 361 A.2d 916, 920 (Me.1976). The converse proposition also holds true. An officer cannot continue to press his investigation when he discovers new evidence demonstrating that his original interpretation of his suspect's actions was mistaken. *See* W. LaFave, *Search and Seizure* § 9.3 at 28 (Supp.1983).

■ An officer has the duty to discontinue the investigation and forego a Terry-type stop of the individual when by the time of the intended stop justification for the initial suspicion has evaporated. *United States v. Posey*, 663 F.2d 37, 41 (7th Cir.1981), cert. denied 455 U.S. 959, 102 S.Ct. 1473, 71 L.Ed.2d 679 (1982). Langella's original suspicion that Garland might have had a gun in his hand and that a burglary may have been in the making because of the slow movement of the automobile should have been completely dispelled by the time the officer reached the Garland vehicle. Based on an objective analysis of the whole picture, the circumstances known to the officer offered no reasonable support for entertaining his original suspicion and for a further inquiry in the matter. Police are expected to no-

tice factual evidence showing a suspect's innocence of criminality as much as they should be vigilant in seeking evidence of guilt.

In *State v. Chatton*, 11 Ohio St.3d 59, 463 N.E.2d 1237 (1984), a police officer on patrol observed an automobile without front and rear permanent license plates. Initiating an investigation for possible violation of the State's motor vehicle laws, the officer directed the operator to the side of the road. As the officer approached the car on foot, he observed for the first time a temporary license placard of the cardboard variety lying on the rear deck of the vehicle directly beneath the rear window. Acting under the mistaken belief that it was a violation of law not to display temporary license tags, the officer then pursued his investigation by requesting the operator to produce his driver's license. With Chatton's license in hand, the officer returned to the patrol car to conduct a computer check of the validity of the license. This produced the information that Chatton's license was under suspension. Chatton was then arrested for driving while under suspension. A subsequent search of the passenger compartment of the car revealed a loaded revolver under the driver's seat. As a matter of fact, the operator's license was not under suspension. Indicted for carrying a concealed weapon, Chatton moved to suppress evidence of the gun on the basis that the search of the vehicle was unlawful, since the officer's detention of the individual from the moment of the officer's observance of the temporary tag in the car was itself unlawful. The Ohio Court quoted from *Delaware v. Prouse*, 440 U.S. 648 at 663, 99 S.Ct. 1391 at 1401, 59 L.Ed.2d 660, (1979):

> [E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the regis-

tration of the automobile are unreasonable under the Fourth Amendment.

The Ohio Court held unlawful the detention of the operator of that car for the purpose of determining the validity of his driver's license and that the subsequent search of the vehicle was an unreasonable search prohibited by the Fourth Amendment to the United States Constitution, thus rendering the evidence of the gun seized in the course of the search inadmissible at trial. The factual circumstances surrounding Officer Langella's detention of Garland in requesting that he identify himself by producing his driver's license and furnish the car registration were no more indicative of criminal conduct than was the situation in *Chatton.*

▮ Two other possible crimes might be thought to be suggested by Garland's middle of the road urination. One such crime is that of indecent exposure. 17–A M.R.S.A. § 854.[1] Officer Langella testified that he was not offended; he did not see Garland's genitals; Garland had turned his back, away from the direction from which Langella approached; no other cars or people were in the area; he further added that he would not have been offended, even if Garland had exposed himself to him. Objectively considered, those facts do not support a reasonable suspicion of criminality under that statute.

▮ At oral argument this Court, for the first time in any of the proceedings in this case, raised the question, whether Langella might have suspected that Garland was operating while under the influence of intoxicating liquors. We hesitate to search for additional criminal activity beyond those appearing on the face of the record. An appellate court should lend some measure of deference to judgments actually made in the field by an experienced officer. *See United States v. Cortez,* 449 U.S. 411, 419, 101 S.Ct. 690, 695–

696 (1981). By the same token, however, we cannot relieve an officer of the duty to actually testify respecting the bases for, and the nature of, his suspicions. To do otherwise would impute to the officer a suspicion of criminal activity that perhaps he never entertained and that a person observing the events as they took place in the field might never have had. LaFave has explained that

> it is for the police to articulate the facts and what their experience reveals as to those facts. The officer must relate what he has observed, and, when appropriate, indicate why his knowledge of the crime problem and the habits of the residents on his beat or of the practices of those planning or engaging in certain forms of criminal conduct gives special significance to what he observed. There are limits, of course, on what may be expected from the police in terms of verbalizing their observations and impressions, but a reasonably specific statement by an officer of the circumstances underlying his action—when considered together with how he in fact reacted to the situation which confronted him—should afford an adequate basis for judicial review (footnotes omitted).

3 W. LaFave, *Search and Seizure* § 9.3 at 62 (1978). As a matter of prudential appellate review, we decline to impute to Officer Langella from his observation of the slow operation of the automobile and from Garland's stop to urinate in the road a suspicion that Garland may have been operating while under the influence, where the officer never testified to harboring any such suspicion.

▮ Because a stop, as in the case of a search, must be carefully circumscribed at the police level by the reasons that caused its undertaking (*see Sibron v. New York,* 392 U.S. 40, 65, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917, 936 (1968)), this Court

---

1. 17–A M.R.S.A. § 854. *Public indecency.*

 1. A person is guilty of public indecency if:
 A. In a public place

 · · · · ·

(2) he knowingly exposes his genitals under circumstances which, in fact, are likely to cause affront or alarm; or

 · · · · ·

could hardly determine the proper scope of a particular stop, were we to introduce a new rationale not used by the police in their decision to detain the suspect. In *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Government argued for the first time on appeal before the United States Supreme Court that the location of the stop of the vehicle should be considered in deciding whether the officers had adequate reason to halt the respondent's car. The Court stated that this appeared.to be an after-the-fact justification, since at trial the officers gave no reason for the stop except the apparent Mexican ancestry of the car's occupants, with no broader pretextual explanation being raised in the Court of Appeals so far as the record demonstrated. The Court expressly declined to give any weight to that specific circumstance, *i.e.* the location of the stop. *Id.* 422 U.S. at 885, 95 S.Ct. at 2582, n. 11. We conclude that whatever merit there might be to the suggestion that the facts of this case in their totality could lead a reasonable person to suspect that Garland was operating under the influence (but we do not intimate any opinion thereon), such a suspicion never became a factor in the mind of the investigating officer and thus cannot now form the basis to support the present *Terry* type detention.

■■■ Hence, we hold that Officer Langella, in accosting Garland and asking him to identify himself and detaining him for a warrants check committed an unreasonable seizure of his person violative of the defendant's Fourth Amendment rights and that the evidence of his operation while a habitual offender obtained as a result of the illegal stop was inadmissible and should have been suppressed. There being no other evidence of Garland's violation of this motor vehicle infraction, the defendant's conviction must be reversed.

The entry is:

Judgment of conviction reversed.

All concurring.