STATE of Maine

v.

Kenneth CHAPMAN.

Supreme Judicial Court of Maine.

Argued May 10, 1985.

Decided July 3, 1985.

R. Christopher Almy, Dist. Atty., Patricia Locke, (orally) Ann M. Murray, Asst. Dist. Attys., Bangor, for plaintiff.

Vafiades, Brountas & Kominsky, Jeffrey L. Hjelm, (orally) Marvin H. Glazier, Bangor, for defendant.

Before McKUSICK, C.J., and NICHOLS, VIOLETTE, WATHEN and SCOLNIK, JJ.

SCOLNIK, Justice.

A Superior Court jury, Penobscot County, convicted the defendant of operating a motor vehicle when his operator's license

was suspended under the habitual offender statute. 29 M.R.S.A. 2298 (1983). He appeals from the denial of his pre-trial motion to suppress the evidence of his habitual offender status on the ground that it was illegally obtained. He also argues that certain evidence, without which, he asserts, he could not have been convicted, was inadmissible hearsay. Because the evidence of his habitual offender status was obtained as a result of an unjustified investigatory stop, we vacate the conviction.

## I.

At 2:30 a.m. on November 18, 1983, a city police officer Orval Moor drove down Griffin Road past the Airport Mall in Bangor. He observed a pick-up truck moving through the Mall parking lot at "high speed." It was traveling from the back of the lot, past the rear of the stores, toward the exit onto Griffin Road. The Mall stores were closed. The officer testified that people do not "normally" drive through that part of the lot, though he knew that some "occasionally" did so to avoid two sets of lights on Griffin Road. That, he stated, is not, by itself, a "criminal activity." When the truck turned onto Griffin Road, Moor followed it a short distance until it parked at the 7-Eleven store on Ohio Street.

Moor parked immediately behind the truck, blocking any movement. He glanced into the truck bed "because that was one of the reasons [he] wanted to stop the truck," but did not say that he saw anything. At that time Moor had heard no report of any criminal activity at the Mall and he articulated no other reason for stopping the truck.[1] He asked the Defendant, who was alighting from the door on the driver's side, why he had driven through the Mall. The Defendant replied that he was just "passing through."

Moor then asked the Defendant either what his name was, or who owned the truck, or both.[2] In answer to one or the other or both questions the officer heard "Misty Poole." At that point, Moor was "satisfied.... [He] didn't feel that there was any criminal activity going on...." He withdrew to the adjacent parking lot and the Defendant entered the store.

Calling in a registration check, Moor learned that a Frank Chapman owned the truck. He then moved his car back behind the truck, got out, and met the Defendant who had just left the store. At this point, Moor said, he had not been told that the truck was stolen, nor had he seen any other indication of "specific criminal activity." He again asked the Defendant who he was and who owned the truck. The Defendant produced the registration in the name of Frank Chapman, whom he identified as his uncle. At that point, Moor testified, he had no reason to believe the truck was stolen.

The Defendant then denied having any license or other identification with him. Moor, however, noticed a bulge in the Defendant's pocket and suggested that he remove it. Complying, the Defendant denied ownership of the wallet he produced. He looked briefly through it, allowing the officer a glimpse of an identification card. Moor took the wallet, looked through it himself, and found a State "Liquor Identification Card" bearing Kenneth Chapman's name and birthdate. He put the Defendant in the police car where, either via radio or from the Defendant himself, he learned that the Defendant was under suspension as a habitual offender.

The Defendant moved to suppress the evidence of his habitual offender status, contending it was obtained as the result of an unreasonable search and seizure. At the suppression hearing, Moor clearly articulated the factual circumstances in which he first sighted the truck. However, the

1. When asked *at trial* why he did not stop the truck before reaching the 7-Eleven, he stated, "I had no reason to stop it. It just struck my suspicion why it was parked there. It had not

committed any motor vehicle infractions that I was aware of at that time."

2. He could not remember at the motion hearing. At trial, he testified that it was both.

only reason he gave for stopping it was that he wanted to look into the back. He did not testify to having had any suspicion of criminal activity at all, whether already committed or to be committed by the Defendant. Indeed, after having confronted the Defendant once, Moor was "satisfied" that there was no "criminal activity" afoot.

The Superior Court denied the motion to suppress. After reciting the facts, it stated,

> [n]ow it seems to me there was an articulable suspicion to inquire of the operator of this vehicle seen operating in the place it was first observed, considering the totality of the circumstances, time of night, between 2 or 3 o'clock in the morning, and vehicle behind the stores closed for business for the night, unusual speed. It seems to me to be articulable suspicion to inquire of the operator for purposes of identification and also to see if there was anything in the body of the pick-up truck. It certainly raises the question in a reasonable man's mind or a reasonable officer's mind that there may have been a break, under all the circumstances, into those stores; and once the *Terry*-type investigatory confrontation with the Defendant was made, the Defendant lies to the officer by giving him a false name on the truck registration, and that certainly generates more articulable suspicion. Then there would be, certainly, in a reasonable officer's mind, some question of whether the truck was stolen or not being used with the owner's permission or what have you. So I think there was a *Terry*-type investigation involved here, that there were articulable suspicions, and that the police procedure was entirely proper.

The Defendant was convicted after a jury trial at which another Justice presided.

## II.

■ The Defendant argues that the evidence of his habitual offender status was obtained in an investigatory stop that did not meet the Fourth Amendment requirement of "reasonableness" as interpreted by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and cases following it. The motion Justice correctly recognized that Officer Moor's initial confrontation with the Defendant, after positioning the police car so as to prevent any movement of the truck, was a *"Terry-type"* investigatory stop. *E.g., United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Opinion of Stewart, J.). The question, then, is whether the officer had a reasonable suspicion of criminal activity, grounded in specific and articulable facts, at the time he first requested that the Defendant identify himself. *United States v. Hensley,* —— U.S. ——, 105 S.Ct. 675, 681, 83 L.Ed.2d 604 (1985); *State v. Griffin,* 459 A.2d 1086, 1089 (Me.1983).[3]

At the hearing on this motion to suppress, the officer himself did not testify that he had had any suspicion at all, let alone a reasonable one. The closest he came was in stating that "one of the reasons I wanted to stop the truck" was to look in the back. Not only had he no report of a break-in at the Mall stores, he never articulated any such suspicion. The only suspicion voiced was by the Justice in ruling on the motion. Relying on our opinion in *State v. Garland,* 482 A.2d 139 (Me. 1984), the Defendant argues that the Justice may not supply suspicions to which the

---

**3.** Though the Justice used the phrase "articulable suspicion," this is not the sole standard because an unreasonable suspicion may be articulable. Despite the use of "articulable suspicion" alone in *Florida v. Rodriguez,* —— U.S. ——, 105 S.Ct. 308, 310, 83 L.Ed.2d 165 (1984), and *State v. Thurlow,* 485 A.2d 960, 963 (Me.1984), the Fourth Amendment requires at least that the suspicion be "articulable *and* reasonable." *E.g.,*

*United States v. Sharpe,* —— U.S. ——, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). Nonetheless, the Justice explicitly answered the question whether the facts would have warranted "'a man of reasonable caution in the belief' that the action taken was appropriate," *United States v. Terry,* 392 U.S. at 22, 88 S.Ct. at 1880, so we ascribe no significance to his incorrect phrasing of the standard of reasonableness.

officer never testified, and thus that the motion was wrongly denied.

■ We said in *Garland* that, as a matter of appellate review,

> we cannot relieve an officer of the duty to actually testify regarding the bases for, and the nature of, his suspicions. To do otherwise would impute to the officer a suspicion of criminal activity that perhaps he never entertained and that a person observing the events as they took place in the field might never have had.

.　　.　　.　　.　　.

> As a matter of prudential appellate review, we decline to impute to Officer Langella from [the facts to which he testified] a suspicion that Garland may have been operating under the influence, where the officer never testified to harboring any such suspicion.

482 A.2d at 145. While the Law Court will not draw its own inferences in such a case, this is because we are only reviewing the determination of the motion Justice. However, that Justice has the task of making the factual findings in the first instance, and he is free to draw reasonable inferences in doing so.

■ To determine the constitutionality of the stop, the Justice must decide whether the police acted "on the basis of 'specific and articulable facts which, *taken together with rational inferences from those facts*, reasonably warrant that intrusion.'" *State v. Griffin*, 459 A.2d at 1089; *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1880 (emphasis added). As we also said in *Garland*,

> [t]here are limits, of course, on what may be expected from the police in terms of verbalizing their observations and impressions, but a reasonably specific statement by an officer of the circumstances underlying his action—when considered with how he in fact reacted to the situation which confronted him—should af-

ford an adequate basis for judicial review.

482 A.2d at 145, quoting from 3 W. LaFave, *Search and Seizure* § 9.3 at 62 (1978). It is thus apparent that the motion Justice may find, from the officer's testimony, that the officer had a suspicion of criminal activity even though the officer fails explicitly to say so.[4] Should the Justice make such a finding, he must then, of course, determine whether the suspicion was reasonable. We review his findings only for clear error. *State v. Thurlow*, 485 A.2d at 963.

■ Nonetheless, the court clearly must find that the police *actually had* such a suspicion at the time of the investigatory stop. A finding that *a reasonable person could have had* a reasonable suspicion on the given facts is not *alone* sufficient, since a *post hoc* rationalization cannot justify an arbitrary invasion of one's privacy. The United States Supreme Court has "consistently refused to sanction" "intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Terry v. Ohio*, 392 U.S. at 22, 88 S.Ct. at 1880; *see Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). The officer's inarticulate hunch cannot be converted into a "reasonable suspicion" by second thoughts developed at the suppression hearing.

The motion Justice was not clearly erroneous in finding that the facts as stated, could "raise the question in a reasonable man's mind or a reasonable officer's mind that there may have been a break, under all the circumstances, into those stores." The crucial issue, then, is whether *Officer Moor himself* had such a suspicion when he first stopped the Defendant. Without such a finding, the ruling that the stop was *objectively reasonable* is irrelevant.

■ The Justice's statement that, "it seems to me there was an articulable suspicion to inquire of the operator of this ve-

---

4. It would certainly be preferable for the prosecutor to elicit this testimony from the officer, rather than to place the burden of articulating the officer's suspicions on the Justice.

hicle," is the only one that might be interpreted to constitute such a finding. The Justice later stated again that, "there were articulable suspicions," this time referring also to the second confrontation. The rest of his findings, reprinted above, clearly refer to the *objective* reasonableness of a stop on the basis of the articulated facts. Although these statements are ambiguous, "we must assume that the Superior Court made all of the findings necessary to its decision." *State v. Moulton*, 481 A.2d 155, 163 (Me.1984); *State v. Walker*, 341 A.2d 700, 702 (Me.1975). We conclude, however, that a finding that Moor himself was prompted by the suspicion of a break-in at the Mall would have been clearly erroneous.

Not only did Officer Moor not articulate any suspicion, but his one expressed purpose in stopping the truck, to look in the back, was accomplished before he requested the Defendant's identification. Whatever prompted his desire to look in the truck was apparently insubstantial, since, having received a response to his first question, he "was satisfied at that point. [He] didn't feel there was any criminal activity going on at that point." There had been "nothing illegal or nothing that particularly attracted [his] attention about the manner in which [the truck] was being operated." There was, he said, no criminal activity "that I could see."

Given that testimony, it is clear that Moor's desire to look into the truck was prompted by no more than an insufficient inarticulate hunch. This conclusion is supported by his statement at trial that, "I had no reason to stop it. It just struck my suspicion why it was parked [sic] there. It had not committed any motor vehicle infractions that I was aware of at that time." That statement was not before the motion Justice, and the Defendant did not renew his motion to suppress after the officer made it. We could not, therefore, rely on it alone in determining whether the finding was clearly erroneous. But its existence confirms the conclusion we draw from

Moor's testimony at the motion hearing. A finding that Moor himself suspected a break-in at the Mall would be only speculation.

Accordingly, we conclude that the initial stop to request the Defendant's identification does not satisfy the Fourth Amendment. Because the evidence of his habitual offender status was obtained as a result of this unjustified stop, we vacate the conviction on that ground, and thus need not address either the constitutionality of the second request or the Defendant's evidentiary contention.

The entry is:

Judgment vacated.

Remanded to the Superior Court for proceedings consistent with the opinion herein.

All concurring.